# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mahmoud Yousefzadeh<br><br>Plaintiff,<br><br>v.<br><br>Hill-Rom Co., Inc.,<br><br>Defendant. | Case No. 17-cv-05501 (SRN/TNL)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Michael A. Fondungallah, Fondungallah & Kigham, LLC, 2499 Rice Street Suite 154, Saint Paul, Minnesota 55113, for Plaintiff.

Alice D. Kirkland and Kerry L. Middleton, Littler Mendelson, P.C., 1300 IDS Center, 80 South 8th Street, Minneapolis, Minnesota, 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

Before the Court is Defendant Hill-Rom Co., Inc.'s ("Hill-Rom") Motion for Summary Judgment [Doc. No. 73] seeking dismissal of Plaintiff Mahmoud Yousefzadeh's claims. The Court agrees with Hill-Rom's arguments in all relevant aspects, and for the reasons discussed below, grants its summary judgment motion in full.

## I.     BACKGROUND

The events underlying this case occurred over a seven-month period from late-2015 through early-2016. In setting forth the factual background below, the Court is mindful that in considering this summary judgment motion, the Court must "view[] the evidence in the light most favorable to the nonmoving party," namely, Yousefzadeh. *Grinnell Mut.*

*Reinsurance Co. v. Schwieger*, 685 F.3d 697, 700 (8th Cir. 2012). The Court must not, and will not, "weigh the evidence and determine the truth of the matter itself[.]" *Nunn v. Noodles & Co.*, 674 F.3d 910, 914 (8th Cir. 2012).

**A. The Parties**

Plaintiff Mahmoud Yousefzadeh is an Iranian American citizen of the United States and a practicing Muslim. (2d Am. Compl. [Doc. No. 34] at 1, 3.) At all times relevant to this case, Yousefzadeh was employed by Hill-Rom at its St. Paul, Minnesota facility as a Quality Assurance and Regulatory Affairs ("QA/RA") Engineer. (*Id.*)

Defendant Hill-Rom is a medical technology company that designs, manufactures, sells, rents, and services a variety of medical equipment. (*See* Hill-Rom Mem. in Supp. of Mot. for Summ. J. ("Hill-Rom Mem.") [Doc. No. 75] at 2.) The company operates a warehouse and manufacturing facility in St. Paul, Minnesota. (*Id.*)

**B. Hill-Rom Moves Manufacturing to St. Paul, Minnesota**

In 2015, Hill-Rom closed its manufacturing operations in Charleston, South Carolina, and shifted those operations to St. Paul, Minnesota. (*See* Shatava Decl. [Doc. No. 77] at 1.) As part of that transition, Hill-Rom established a Quality Assurance/Regulatory Affairs ("QA/RA") Department in St. Paul and promoted one of its employees, Amie Klager, to be the first QA/RA Manager at the facility. (*Id.*)

Upon assuming her new role, Klager sought applicants for two new positions at the St. Paul facility: (1) a QA/RA Engineer position, and (2) a QA/RA Technician position. (Klager Decl. [Doc. No. 79] at 1.) Klager, along with Donna Shatava (of Hill-Rom's Human Resources Department), interviewed five or six candidates for the QA/RA Engineer position.

(Shatava Decl. [Doc. No. 77] at 2.)  One of those candidates was the Plaintiff, Yousefzadeh, (*id.*), who had seen an advertisement for a related position and had been communicating with a recruiter about possibly working for Hill-Rom.  (Kirkland Decl. Ex. A ("Pl. Depo.) [Doc. No. 76-1] at Dkt. 3, Depo. 53–56.)[1]  Yousefzadeh was given a job description for the QA/RA Engineer role before interviewing.  (*Id.* at Dkt. 3, Depo. 53–54.)

### C. Yousefzadeh is Hired

At his interview, which involved both Shatava and Klager, Shatava informed Yousefzadeh that the Quality Department in St. Paul was new and that, accordingly, the engineer position was also new.  (Shatava Decl. [Doc. No. 77] at 2.)  Klager also explained to Yousefzadeh that because the St. Paul department was new, specific job duties for the role were not yet fully established and that the QA/RA Engineer position would be "responsible for a wide range of tasks."  (Klager Decl. [Doc. No. 79] at 1–2.)  Yousefzadeh asked numerous questions during his interview, testified that he was impressed that he and Klager shared similar work characteristics, and appreciated that they were both "thinker[s]" and "process-oriented" individuals.  (Pl. Depo. [Doc. No. 76-1] at Dkt. 4, Depo. 57–60.)  He also asked questions about training and was informed that there was standard operating procedure training and general orientation trainings in place.  (*Id.* at Dkt. 5, Depo. 61–62.)  Yousefzadeh does not recall any mention of his race, religion, or national origin during the interview.  (*Id.* at Dkt. 5, Depo. 62.)  After the interview was over, Yousefzadeh left feeling "good" about the position.  (*Id.* at Dkt. 5, Depo. 63.)  He testified that his understanding of the position at the

---

[1]  Where two sets of numbers are used in citations, the "Dkt. __" refers to the Docket No. pagination, and the "Depo. __" refers to the internal deposition transcript pagination.

time was that he would be in the "quality department" and that if he was hired, the Quality department would consist of only him, a "quality technician," and his manager, Klager. (*Id.* at Dkt. 6–7, Depo. 76, 79.)

After considering the candidates, Klager decided to hire Yousefzadeh because he appeared to be the best candidate for the job. (Klager Decl. [Doc. No. 79] at 2; *see also* Shatava Decl. [Doc. No. 77] at 2–3 (noting Shatava supported Klager's decision because Plaintiff was a senior engineer with a strong background ideal for the wide variety of responsibilities the engineer in St. Paul would face); Fondungallah Decl. Ex. 1 Pl. Resume [Doc. No. 82-2] at 2–5 (listing Yousefzadeh's education and credentials).) Yousefzadeh was offered the position, (*see* Kirkland Decl. Ex. E Offer Letter [Doc. No. 76-1] at 39.), which he accepted, (*see id.* at 41; Klager Decl. [Doc. No. 79] at 2.) He later testified that at the time he accepted the position, he understood that his job duties were listed in the QA/RA Engineer description, but that those listed duties—while essential and "primary"—were not exclusive. (Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at Dkt. 8–9, Depo. 84–85.) Indeed, as evidence of that fact, Shatava testified that one of the duties Yousefzadeh would be responsible for was documentation control changes, which stemmed from Hill-Rom's move from South Carolina to St. Paul, and required the Quality System Team (to which Yousefzadeh belonged) to convert documents to reflect the switch to St. Paul. (Kirkland Decl. Ex. C ("Shatava Depo.") [Doc. No. 76-1] at Dkt. 32, Depo. 19–20.) While this responsibility was not listed in the job description, Shatava explained that it fell under the language requiring the engineer to "[l]ead or support any required quality improvement activities in St. Paul," and the project was temporary. (*Id.* at Dkt. 33, Depo. 22–25.)

Klager also hired Bob Whittemore as a QA/RA Technician, which Yousefzadeh admits is a position ranked below a QA/RA Engineer. (Pl. Depo. [Doc. No. 76-1] at Dkt. 18, Depo. 225.) Klager testified that the QA/RA Technician position is in fact a "lower level position" that—unlike the QA/RA Engineer position—does not require that the employee have an engineering degree. (Klager Decl. [Doc. No. 79] at 2.)

Yousefzadeh began his employment at Hill-Rom on October 28, 2015. (Shatava Depo. [Doc. No. 76-1] at Dkt. 32, Depo. 20.) That same day, he provided a signed release indicating that he had received and read Hill-Rom's policies on, among other things, technology, prohibiting harassment, equal employment opportunity, the Hill-Rom Code of Conduct Escalation, and company integrity. (Kirkland Decl. [Doc. No. 76-2] at 12; *see also* Middleton Decl. Ex. A Pl. Depo. [Doc. No. 86-1] at Dkt. 5, Depo. 91 (Yousefzadeh indicating he signed the policy statement release); Shatava Depo. [Doc. No. 76-1] at Dkt. 34, Depo. 82–83. (identifying Yousefzadeh policy statement release and testifying he signed it on October 28, 2015).) Yousefzadeh later testified that he signed the policy statement without receiving the policies—although there is no independent evidence supporting that assertion—because he assumed the policies were in the employee handbook (a document he also received). (Pl. Depo. [Doc. No. 86-1] at Dkt. 5, 8, Depo. 91, 104.) However, he also signed a *separate* handbook release apart from the Hill-Rom policy release. (*Id.* at Dkt. 8, Depo. 104.)

### D. Hill-Rom's Policies

Hill-Rom's Employee Handbook contains detailed statements prohibiting any form of harassment, misuse of company technology, or retaliation, and describes Hill-Rom's commitment to equal employment opportunities. (*See* Kirkland Decl. Ex. F Hill-Rom

Employee Handbook [Doc. No. 76-1] at 47.) Hill-Rom maintained a general "business casual" dress code for office and warehouse employees, subject to some exceptions for safety-related reasons. (*Id.* at 58; *see also* Pl. Depo. [Doc. No. 76-1] at Dkt. 9, Depo. 124 (Yousefzadeh acknowledging awareness of dress code).) Discipline for violation of company policies "may or may not be progressive, depending upon the circumstances," and could include "possible immediate dismissal." (*Id.*) If the unacceptable employee behavior did not result in immediate dismissal, Hill-Rom used an escalating discipline approach, beginning with a verbal warning, following by written warnings, unpaid suspension or final warnings, and then dismissal. (*Id.* at 64.) Hill-Rom maintained the right to "accelerate and skip the progressive [discipline] steps." (*Id.*)

Hill-Rom also maintains separate policy statements—which Yousefzadeh's policy statement release form references—prohibiting harassment and discrimination in any form, describing appropriate technology use, and reaffirming Hill-Rom's commitment to equal employment opportunities. (*See* Kirkland Decl. Exs. G (EEO and Non-Discrimination Policy), H (Anti-Harassment Policy), & I (Technology Policy) [Doc. No. 76-2] at 2, 5-6, 9.) Despite these statements, Yousefzadeh contends that he was unaware that "harassment, sexual, racial or otherwise," could result in discipline or termination. (Pl. Depo. [Doc. No. 76-1] at Dkt. 8, Depo. 117–118.)

### E. Problems Begin

Shortly after Yousefzadeh was hired, Klager "developed significant concerns about his knowledge, performance, and ability to perform all the responsibilities of the QA/RA Engineer role" to her expectations. (Klager Decl. [Doc. No. 79] at 4.) As noted above, one

of Yousefzadeh's first assignments was to assist with document control, which involved revising policies and procedures that were initially designed for Hill-Rom's South Carolina facility. (*Id.*) More than 800 policies required revision. (*Id.*) According to Klager, Yousefzadeh performed his portion of the project "very slowly and repeatedly returned documents with numerous errors" and frequently "questioned [Klager's] authority to review and reject the documents he revised, despite the fact that [Klager] was his direct supervisor[.]" (*Id.* at 4–5.) Yousefzadeh argued—and continues to argue now—that "document control tasks and supplier quality engineering responsibilities were not explicitly referenced in his job description" and therefore he was not responsible for completing them. (*Id.* at 5; *see also* Pl. Depo. [Doc. No. 76-1] at Dkt. 16, 187–188 (Yousefzadeh arguing that document control was not something he had ever done before and was not what he was hired to do).) Klager repeatedly explained to Yousefzadeh that he was required to participate in document control, but he refused to accept her explanations. (Klager Decl. [Doc. No. 79] at 5.) Yousefzadeh later admitted, however, that there was "absolutely" nothing wrong with Klager asking him to take on new tasks—like document control—so long as the requests were not discriminatory. (Pl. Depo. [Doc. No. 76-1] at Dkt. 16, Depo. 188.)

Throughout his employment with Hill-Rom, Shatava was involved in Yousefzadeh's perceived performance deficiencies, frequently encouraging Klager to coach Yousefzadeh on his job responsibilities. (Shatava Decl. [Doc. No. 77] at 3.) Yousefzadeh also frequently asked for additional training. (*Id.*) Shatava (and other Hill-Rom employees) provided training where available, but noted that many of the areas Yousefzadeh sought training for were in the realm of tasks that he was expected to already

know how to do when he was hired.  (*Id.*)  Moreover, Yousefzadeh appears to have received numerous trainings on a wide variety of Hill-Rom-specific responsibilities over the course of his employment with the company.  (*See* Shatava Decl. Ex. A Pl. Agile Training Records [Doc. No. 77-1] at 2–10 (showing completed trainings on anti-discrimination, harassment, employee handbook knowledge, document control and changes, and document control analysis and approval).)  No matter how many trainings were provided, Shatava noted that Yousefzadeh never felt satisfied by the amount of training he received.  (Shatava Decl. [Doc. No. 77] at 3.)

On November 13, 2015, Klager took Yousefzadeh out for lunch.  (Pl. Depo. [Doc. No. 76-1] at Dkt. 8, Depo. 120.)  Klager and Yousefzadeh describe this lunch very differently; for Yousefzadeh, it is the starting point for his claims of discrimination and harassment.  (*Id.* at Dkt. 8, Depo. 119–120 (noting that for the first couple weeks of his employment, Yousefzadeh did not feel Klager was treating him any differently from other employees).)  From Yousefzadeh's perspective, he considered the lunch meeting to be a "thank you" for assisting with an audit but found it strange that only he and Klager went to lunch when there were other team members helping with the project.  (*Id.* at Dkt. 8, Depo. 120.)  During lunch, Yousefzadeh says Klager asked him "discriminatory" questions, including questions about his religion, his background, his wife, and his citizenship status. (*Id.* at Dkt. 8, Depo. 118–119.)  Klager also discussed her own religion at that time.  (*Id.* at Dkt. 8, Depo. 119.)  Yousefzadeh does not recall any other comments beyond Klager asking him to identify his religion, national origin, and race, and admits that no one else at Hill-Rom ever asked him about, or discussed with him, his religion, national origin, or race

8

at any point during his employment. (*Id.* at Dkt. 9, Depo. 121–123; *see also id.* at Dkt. 15, Depo. 177–180.)

From Klager's perspective, she invited Yousefzadeh to lunch to get to know him better. (Klager Decl. [Doc. No. 79] at 6.) She recalls that during the lunch meeting, Yousefzadeh shared some information about his background, and believes he may have mentioned he or his wife was born in Turkey or Iran, but she has no memory of Yousefzadeh informing her that he was a practicing Muslim. (*Id.*)

After this lunch meeting, Yousefzadeh contends Klager began treating him differently from other employees. From his perspective, Klager began slowly changing his job responsibilities to include things that he did not know how to do, just so he would fail. (Pl. Depo. [Doc. No. 76-1] at Dkt. 16, Depo. 186–187.) This included the document control project. (*Id.* at Dkt. 16, Depo. 187–188.) He also contends that Klager would criticize him, raise her voice at him, use raw or harsh language, and would not accept explanations for why he did things the way he did. (*Id.* at Dkt. 14, Depo. 174.) Specifically, he testified that Klager accused him of being "slow to learn things" and that his performance was not meeting Hill-Rom's standards and requirements. (*Id.* at Dkt. 15, Depo. 177.) Yousefzadeh admits that Klager was within her rights to criticize his performance as his manager (but believes her actions were discriminatory while doing so), and acknowledges that he does not "learn things as fast as other people" which was what Klager was "referring to [about] [Yousefzadeh's] performance." (*Id.* at Dkt. 14, Depo. 175–Dkt. 15, Depo. 177; *see also* Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at Dkt. 38–39, Depo. 362–363.)

### F. Human Resources Involvement

Hill-Rom's Human Resources department became involved with Yousefzadeh's claims in December of 2015; the departments' involvement is documented through numerous emails and notes from meetings or phone calls between the relevant parties.

Beginning in December of 2015, Klager began consulting with HR, including Shatava and Shane Reif (who, at the time, was an HR Manager for QA/RA groups nationwide), regarding her concerns with Yousefzadeh's performance. (Klager Decl. [Doc. No. 79] at 5–6.) HR attempted to assist Klager with coaching Yousefzadeh, but Yousefzadeh apparently resisted her coaching efforts. (*Id.*) In Klager's words, she did not expect an experienced engineer like Yousefzadeh to require step-by-step training on most things, but attempted to assist him regardless. (*Id.*)

On January 7, 2016, Yousefzadeh emailed Klager taking issue with her assignment of document change processing responsibilities and asked that he not be assigned such projects. (*See* Kirkland Decl. Ex. K [Doc. No. 76-2] at 14–15.) Around that time, as part of the ongoing coaching efforts, Shatava began sitting in on weekly one-on-one meetings between Yousefzadeh and Klager. (Shatava Decl. [Doc. No. 77] at 3–4.) Yousefzadeh contends that Shatava took notes during those meetings, but did not speak up or interject when Klager purportedly raised her voice and used harsh language against him in the meetings. (Pl. Depo. [Doc. No. 76-1] at Dkt. 14, Depo. 173–174.)[2]

---

[2] Aside from remaining silent when Yousefzadeh felt that Shatava should have spoken up, Yousefzadeh does not believe Shatava engaged in any discriminatory behavior. (Pl. Depo. [Doc. No. 76-1] at Dkt. 15, Depo. 176.)

On January 25, 2016, Yousefzadeh emailed a letter to Hill-Rom Human Resources claiming that Klager was impermissibly changing his job duties, ignoring his repeated requests to not have to do document control changes, and, in response to his requests, had begun to "retaliate, mistreat, and harass[]" him. (Kirkland Decl. Ex. L & M [Doc. No. 76-2] at 17–18, 21.) He asked that Human Resources "look[] into [his] concerns as soon as possible, because it is not a healthy work environment." (Kirkland Decl. Ex. L [Doc. No. 76-2] at 18.) Both Shatava and Reif received Yousefzadeh's email, and Reif informed Yousefzadeh that they had met with Klager to discuss his concerns, and that Klager would be meeting with him to discuss a plan to move forward. (Kirkland Decl. Ex. M [Doc. No. 76-2] at 20.) Shortly after this, Klager sent Yousefzadeh an email asking him to relabel some shelves in the warehouse. (*See* Fondungallah Decl. Ex. 4 [Doc. No. 82-2] at 12.) Yousefzadeh asserts that asking him to label shelves in the warehouse was humiliating because it was a job reserved for "production staff," not a QA/RA engineer. (Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at Dkt. 22, Depo. 182.)

On January 28, 2016, Shatava met with Yousefzadeh and sent an email to Reif with her notes about his complaints. (Shatava Decl. Ex. B [Doc. No. 77-1] at 12–13.) Yousefzadeh told Shatava that (1) he felt that Klager's assignment of document control change duties was a sudden and inappropriate change for which he had no training; (2) Klager was looking for errors in his work; (3) Klager was harassing him, did not trust him, and was giving him too much work; and (4) he never received job-specific training. (*Id.*) Shatava concluded in her notes that Yousefzadeh likely had not received significant training up front, but that after three months at Hill-Rom he should be further along than he was, which evidenced performance

issues. (*Id*. at 13.) She suggested placing him on a Performance Improvement Plan. (*Id.*) In her declaration, Shatava asserts that after meeting with Yousefzadeh, she felt that additional training was warranted, but also thought that Yousefzadeh was exhibiting "clear performance gaps after three months on the job that were not sufficiently explained by any lack of training at Hill-Rom." (Shatava Decl. [Doc. No. 77] at 4.) She also believed Yousefzadeh's complaints of retaliation, mistreatment, and harassment were more accurately a communication issue and a misunderstanding on Yousefzadeh's part of his job duties. (*Id.*)

Yousefzadeh also met with Klager to discuss his concerns and job responsibilities. On February 3, 2016, in a follow-up email memorializing their conversation, Klager indicated that they had "discussed [plaintiff's] job responsibilities and [Klager's] expectations" and that Yousefzadeh's work needed to be "almost perfect most of the time" because the "QA organization sets the tone for the rest of group here, and that bar should be extremely high." (Kirkland Decl. Ex. N [Doc. No. 76-2] at 20.) Klager also made it clear that document control was, for the time being, "a high priority" and that despite Yousefzadeh's dislike of "having multiple tasks remaining open" it was his job to "manage multiple activities to completion." (*Id.*) Klager included a detailed table setting forth Yousefzadeh's job responsibilities, the approximate percentage of his time each responsibility should take, and an estimation of the number of hours per week he should be spending on each job duty. (*Id.* at 20–21.) In response, Yousefzadeh said that he would be sending a follow-up email "clarifying what [he] said" and "what [he] didn't [say]" in their meeting. (*Id.* at 25.) No such email is in the record.

On February 5, 2016, following a global broadcast of a company "Town Hall" presentation, Yousefzadeh sent an email to Hill-Rom's then-CEO John Greisch, telling him

that he was impressed to see how much Greisch promoted diversity, but asking him what to do "when a manager does not like 'Diversity'[.]" (Kirkland Decl. Ex. O [Doc. No. 76-2] at 28.) He further stated that he was "a Muslim but working for a manager who her husband is a Jewish (sic). My manager is trying very hard to see I fail. I have reported her to Human Resources and her manager." (*Id.*) Yousefzadeh later testified why he sent that email:

> [He] had a problem because [his] manager retaliate[d] and had asked [him], and are Muslim (sic), and she's connected to the Jewish, and Muslim and the Jewish did not get along and especially if the person from Iran (sic). Iran, it is enemy of Israel, and Israel, it is enemy of Iran.

(Pl. Depo. [Doc. No. 76-1] at Dkt. 17, Depo. 217–218.) Despite this assertion, Yousefzadeh admits that he and Klager never discussed Israeli/Iranian relations, or any conflict between Jewish and Muslim individuals, during his employment.[3] (*Id.* at Dkt. 18, Depo. 218.)

On February 9, 2016, Yousefzadeh sent another letter by email to both Reif and Brian Cousins (Vice President of QA/RA at Hill-Rom). (*See* Kirkland Decl. Ex. Q [Doc. No. 76-2] at 33–34.) In the letter, Yousefzadeh reasserted that Klager was "harass[ing] and retaliate[ing] against [him]" by "singl[ing] [him] out to harass during one-on-one weekly meeting[s] and [through] her [e]mails." (*Id.* at 33.) He contended that Klager constantly accused him of "not completing [his] daily and weekly work," and that he was usually brought in at the end of projects whereas he would prefer to be brought in at the beginning. (*Id.*) He

---

[3] Around the same time, Yousefzadeh and Reif were emailing each other about the phrase "trust but verify," which Reif asserted was a "common term in business" under which managers "have a sense of trust in those that [they] assign tasks to, but . . . should always verify that the task has been completed[.]" (Kirkland Decl. Ex. P [Doc. No. 76-2] at 31.) Yousefzadeh responded by asserting that in his experience, managers in Minnesota do not use that concept. (*Id.* at 30–31.)

stated that Klager gave him "new assignments daily," only cares about herself, and that she was a "young and inexperienced new manager who need[ed] improvement" in a wide range of skills.  (*Id.*)  Ultimately, he stated that Klager's behavior was causing him "stress and [] other issues . . . mentioned in [his] earlier letters and [e]mails" and asked for help sorting out his concerns.  (*Id.*)  Yousefzadeh testified that he sent this email because he felt that Klager was taking advantage of his one-on-one meetings, and using them to retaliate, harass, and discriminate against him.  (Pl. Depo. [Doc. No. 76-1] at Dkt. 19, Depo. 230–231.)

On February 10, 2016, one day after Yousefzadeh sent his second letter, Klager assigned him additional Supplier Quality duties and reached out to a fellow QA/RA manager to seek out training for Yousefzadeh.  (*See* Kirkland Decl. Ex. R. [Doc. No. 76-2] at 37.) Klager was informed there were no specific training programs for the supplier quality role, but was given some information as to where Yousefzadeh could look for guidance.  (*Id.*)  That same day, Klager also had a "performance conversation" with Yousefzadeh and presented him with a Performance Improvement Plan ("PIP") summarizing his performance deficiencies and setting out a path that would allow both him and Klager to move forward. (Shatava Decl. Ex. D [Doc. No. 77-1] at 19; *see also* Kirkland Decl. Ex. S PIP Mem. [Doc. No. 76-2] at 39–42 (noting Yousefzadeh's performance level was "unacceptable," highlighting his low speed, poor follow-up and communication skills, and low accuracy in work product, and noting he was responsible for document control duties and supplier quality duties).)  The PIP had been developed in consultation with Reif and Shatava.  (*See* Reif Decl. [Doc. No. 78] at 1–2.)  Klager noted in an email to Shatava and Reif that Yousefzadeh declined to sign the PIP, "does not agree with any of it," and feels that "the job he is being

asked to do is different from the job description he was hired with." (Shatava Decl. Ex. D [Doc. No. 77-1] at 19.) She also noted that Yousefzadeh felt that he was working very hard at his job, and that Klager should not add supplier quality roles to his workload. (*Id.*) Paraphrasing the plaintiff's words, Klager reported that Yousefzadeh had told her that she could "fire him tomorrow, but he would likely take legal action." (*Id.*) Later that evening, Yousefzadeh emailed Cousins and Reif asserting that Klager had become "very unhappy due to [his] letters" and was also "very uneasy when she f[ound] out you (Mr. Cousin[s]) [were] coming to St. Paul within [the] next two weeks." (*See* Reif Decl. Ex. B [Doc. No. 78-1] at 5.) He claimed that she had written him up, and that doing so was "clear retaliation and harassment." (*Id.*) He also asserted that he was "not sure why she is doing this to me, because I am Muslim and her husband [is] a Jew." (*Id.*) He also sent a separate email early the next morning on February 11 to Cousins and Reif, attaching Klager's PIP memorandum and asserting that in his many years of experience, he had never "seen an employee get a warning letter regarding his/her performance during training time" and that Klager's PIP memorandum was "clear indication" that Klager was "not ready for the position." (Kirkland Decl. Ex. U [Doc. No. 76-2] at 47.)

Two days later, Yousefzadeh and Klager again discussed his job responsibilities. On February 12, Yousefzadeh emailed Klager seeking clarification about his duties and asked her if he needed to "put more hats on and work as [a] CAPA Quality Engineer, Metrics Quality Engineer, Operations Quality Engineer, Design Quality Engineer, Supplier Quality Engineer, Document Control, and my own Quality Assurance/RA Engineer." (Kirkland

Decl. Ex. T [Doc. No. 76-2] at 44.)  He asked for a "short answer" in response.  (*Id.*)  Klager

emailed him back with the following clarification:

> In [our] discussion, I believe you asked about other entities having specific
> titles for these different roles, and why we do not.  Entities with larger QA
> departments split activities up into different titles, but for smaller entities, the
> responsibilities can be assigned to one or two QA/RA Engineers.  This is based
> on the amount of work to be done proportional to the amount of staff required
> to do it.
>
> I am not suggesting that you work 7 jobs (CAPA QE, Metrics QE, Ops QE,
> DA QE, SQE, Doc Control and QARA Engineer).  There is not enough work
> here in any of those areas to justify one person for each activity.  I'm saying
> that the one QA/RA Engineer job here, as at other small Hill-Rom entities, is
> responsible for many of the areas you mentioned.  Note, your own
> responsibilities do NOT include Design Assurance, which is conducted
> [elsewhere], as we don't own any product DHFs today.  Also, you are not
> responsible for running the document control process; you are responsible for
> submitting documents into the process.  Once we have executed the entity
> update process, this activity will no longer take as much of your time.

(*Id.*)

On February 15, Yousefzadeh again emailed Reif and Cousins, asserting that "Hill-

Rom hired [him] based on the job title and the responsibilities [set forth in the job

description]" but now Klager was assigning him "different job responsibilities" that were

"very different from the" duties that Klager and Yousefzadeh had purportedly agreed on.

(Fondungallah Decl. Ex. 12 [Doc. No. 82-3] at 5–6.)  In response, Cousins informed

Yousefzadeh that he would be coming to St. Paul within a week.  (*Id.* at 5.)

On February 23, 2016, both Reif and Cousins met with Yousefzadeh in person to talk

to him about his concerns and ask follow-up questions.  (Reif Decl. [Doc. No. 78] at 2.)  They

also met with Bob Whittemore, whom Yousefzadeh claimed had received better training.

(*Id.*)  Reif took handwritten notes during the meeting.  (*See* Reif Decl. Ex. C [Doc. No. 78-1]

at 11–13.)  Reif noted that Yousefzadeh believed that Klager did "not want him here," and that he thought that she treated "Bob [Whittemore] differently."  (*Id.* at 11.)  His primary concern, however, was that he felt he was not "doing the job that he was brought here to do." (*Id.*)  When asked about training, Yousefzadeh admitted that Klager had showed him how to do things, but that demonstrations were "not adequate" for him.  (*Id.* at 12.)  He also admitted that he did not know—or at the very least, could not articulate—why he though Whittemore had received better training them him.  (*Id.*)  Reif's notes on his interview with Whittemore reflect that Whittemore thought things were going well, and while training was not "always available" he was able to "figure it out" when necessary.  (*Id.* at 12–13.)  When asked to describe his relationship with Klager, Whittemore said it was "really great" and that he "really likes working with her."  (*Id.* at 13.)

After meeting with Reif and Cousins, Yousefzadeh sent several follow-up emails.  In the first email, he asserted that Cousins "had no interest[] [in] going through the evidence (Documents) that show the patterns of discrimination, harassment, retaliation, etc. by [Klager] against me – instead you were interested in the outcome of our meeting."  (Reif Decl. Ex. E [Doc. No. 78-1] at 17.)  He asked that Klager be replaced with "a non-discriminatory manager very soon, because it is very difficult to work in a hostile work environment" where the "evidence clearly identified my manager [as] a Racist[.]"  (*Id.*)  The next day, Yousefzadeh also forwarded an email from Klager asking him to address some aspects of a work assignment, and "close it" by the end of the week, asserting that it was evidence that Klager "wants [him] to fail."  (Reif Decl. Ex. F [Doc. No. 78-1] at 19.)

On or about February 24, 2016, Yousefzadeh spoke with John Smith, then-Vice President of Human Resources for Hill-Rom, about Klager. (*See* Kirkland Decl. Ex. Y Pl. EEOC Complaint [Doc. No. 76-3] at 10.) In that conversation, Yousefzadeh purportedly told Smith about his concerns and stated that if Hill-Rom does not want him anymore, they should just let him go. (*See* Pl. Depo. [Doc. No. 76-1] at Dkt. 12, Depo. 149–150.) Smith told him Hill-Rom did not want Yousefzadeh to leave the company, but that he was free to leave if he so desired. (*Id.*) They briefly discussed severance packages, at which time Smith informed Yousefzadeh that if he left, he would not get a severance package. (*Id.*) From Yousefzadeh's perspective, Smith seemed to agree with him that Klager was engaging in problematic behavior. (*Id.* at Dkt. 11, Depo. 145–146.)

The next day, February 25, 2016, Yousefzadeh sent a follow-up email to Smith thanking him for discussing his concerns and asserting that he can "clearly conclude that [his] manager['s] intention was to hire[] and punish [him]; being a Muslim, born in the Middle East, having an Iranian wife, and etc." (*See* Fondungallah Decl. Ex. 13 [Doc. No. 82-3] at 7.) He reiterated that he would like to see Klager removed from her position. (*Id.*) Smith took the matter under advisement.

In the meantime, tensions between Yousefzadeh and Klager continued to increase. On March 16, 2016, Klager asked Yousefzadeh to present at Hill-Rom's Global Supplier Quality Council meeting, which was scheduled for late March 2016. (*See* Fondungallah Decl. Ex. 14 [Doc. No. 82-3] at 8–9.) Klager provided Yousefzadeh with a slide deck and instructions to assist him, in addition to responding to his email asking various follow-up questions. (*Id.* at 9.) Yousefzadeh testified that he believed Klager's request that he lead the presentation to

the Council was retaliatory because the supplier quality field was "brand-new to [him]" and "if [he] ma[d]e a mistake, that was embarrassment and humiliation (sic)." (Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at Dkt. 32, Depo. 294.)

On March 22, 2016, Smith emailed Yousefzadeh with his conclusions about his investigation into Yousefzadeh's claims of discrimination, harassment and retaliation. (*See* Kirkland Decl. Ex. V [Doc. No. 76-2] at 49.) After a careful review of his claims, Smith concluded that they were "unsubstantiated." (*Id.*) With respect to the claims of harassment, discrimination, and retaliation by Klager based on his nationality or heritage, Smith concluded that there was "no evidence of harassment and/or discrimination" and could not "discern any acts of wrong-doing . . . based on your perspective that your manager's husband [i]s Jewish, or for any other reason." (*Id.*) Smith also addressed Yousefzadeh's job responsibilities. Regarding the supplier quality engineering role that had been assigned to him, Smith noted that "Supplier Quality is a fair and often typical responsibility of a Quality Engineer" and that "[t]here are no issues, concerns or policy violations based on the management team's request that you assist with, and/or assume SQE responsibilities." (*Id.*) Regarding training, Smith noted that Yousefzadeh had been provided training when training programs existed for a given topic; to the extent he had not been trained on something, it was because such training was not available at Hill-Rom, or it involved an "knowledge we would expect a Quality Engineer to possess prior to hire." (*Id.* at 50.) Nevertheless, Smith noted that Hill-Rom would continue to provide training when possible. (*Id.*) In summary, Smith denied Yousefzadeh's request for a new manager, but decided to remove Yousefzadeh from his PIP and place him on a less severe "formal Action Plan." (*Id.*)

On March 28, 2016, in response to a safety reminder from Klager, Yousefzadeh sent a lengthy email copying Smith, Shatava, and another safety manager expressing numerous concerns with safety at the St. Paul warehouse facility. (*See* Kirkland Decl. Ex. X [Doc. No. 76-2] at 56–57.) In the email, Yousefzadeh asserted that there were several OSHA violations occurring at the St. Paul site. (*Id.*) In concluding the email, he stated:

> I do not understand why you go to the warehouse without either safety shoe or safety glasses, but you are enforcing it on me? I believe this is not about safety – it is a Jewish manager against a Muslim employee because as I explained, in the above, you have no interest in safety.

(*Id.* at 57.)

The same day, Yousefzadeh received an email from Steven Ball, the Director of Environmental Health and Safety at Hill-Rom, thanking him for reporting his safety concerns and responding to each in detail. (*See* Shatava Decl. Ex. C [Doc. No. 77-1] at 15–16.) The next day, March 29, 2016, Yousefzadeh replied to Ball and informed him that his "concerns were not about safety at [the] St. Paul site – it was about [his] manager who ignores the major safety issues but concentrates on a very basis one such as Steel-Toe-Shoe for office staff." (*Id.* at 15.) When asked later about this email, Yousefzadeh testified that he wrote the email because he felt that Klager was enforcing the rules against him, and only him, because he was a Muslim, and she was a Jewish manager. (Pl. Depo. [Doc. No. 76-1] at Dkt. 20, Depo. 305–306.) He did admit that Klager herself is not Jewish—her husband is—but stated that he mentioned religion because "there is hateness between Muslim and the Jewish is going really years, years, years back (sic)." (*Id.* at Dkt. 20, Depo. 306.) He also noted that "hate go[es] both ways" and that he thought that Klager's Jewish husband might be influencing her. (*Id.*)

On March 30, 2016, Reif spoke with Yousefzadeh over the phone, which he documented in contemporaneous notes. (*See* Reif Decl. Ex. G [Doc. No. 78-1] at 21.) Yousefzadeh asserted that Klager was only enforcing safety rules against him because he's Muslim and she's Jewish. (*Id.*) Reif noted that Yousefzadeh's safety concerns—to the extent they were really safety concerns at all—had been addressed. (*Id.*) Reif then spoke with Yousefzadeh about his religious comment, noting that Yousefzadeh's prior allegations of religious discrimination had already been reviewed and were unsubstantiated. (*Id.*) Moreover, just like Yousefzadeh "has the right to work in an environment free of harassment and discrimination, so does his manager." (*Id.*) Because Yousefzadeh's allegations had been found to be groundless, his continued claims of discrimination were "technically a violation of Hill-Rom policy." (*Id.*) In response, Yousefzadeh said he had "many documents that prove his manager harasses and discriminates against him and that he would use them when the time came." (*Id.*) He also asserted that " 'you guys' are not here to see it and that he understands that this is all part of the process." (*Id.*) He reasserted that Klager had been yelling at him, but when pressed for an explanation, Yousefzadeh said "he didn't want to talk about it." (*Id.*) When pressed further for a description of what he meant by "yelling," Yousefzadeh said that Klager had spoken with him while displaying "an angry face." (*Id.*) Reif states in his declaration that his phone call with Yousefzadeh was largely to discuss how repeated comments about his manager's religion, or her husband's religion, interfered with Klager's right to work in an environment free of harassment and discrimination, and that his statements were violating company policy. (Reif Decl. [Doc. No. 78] at 2–3.)

On April 5, 2016, pursuant to Smith's email, Yousefzadeh's PIP was converted into a less-severe Action Plan; he was sent a memorandum to that effect but did not sign it. (*See* Kirkland Decl. Ex. W [Doc. No. 76-2] at 52–54.) On April 16, 2016, Yousefzadeh filed a complaint with the Equal Employment Opportunity Commission, asking for an investigation into his concerns regarding Hill-Rom. (Fondungallah Decl. Ex. 21 [Doc. No. 82-4 at 8–11.)

On April 18, 2016, almost a month later, Yousefzadeh responded to Smith's March 22 email that contained Smith's conclusions about Yousefzadeh's complaints. (*See* Kirkland Decl. Ex. V [Doc. No. 76-2] at 49.) Yousefzadeh said he "respect[ed] [Smith's] opinion regarding [his] charges against [Klager], but [that he] completely disagree[d] with [Smith.]" (*Id.*) Yousefzadeh testified that from his perspective, Smith had previously indicated agreement with his concerns about Klager. (Pl. Depo. [Doc. No. 76-1] at Dkt. 11, Depo. 146–147.) Consequently, when Smith emailed that he could find nothing supporting his complaints, Yousefzadeh felt that Smith had changed course unexpectedly. (*Id.*)

On April 19, 2016, Smith informed Yousefzadeh that he would be flying to St. Paul to meet with him the following day. (*See* Kirkland Decl. Ex. GG [Doc. No. 76-3] at 54.) On April 20, Smith and Yousefzadeh met privately for about an hour. (Pl. Depo. [Doc. No. 76-1] at Dkt. 12, Depo. 151.) During that conversation, Smith offered Yousefzadeh a severance package of seven months' pay. (*Id.* at Dkt. 12, Depo. 152.) Yousefzadeh declined that offer, but later counter-offered through email, asking for one year of pay, six months of health insurance, a waiver of any taxes removed from his 401k, and "some other things." (*Id.* at Dkt. 13, Depo. 155.) Smith said he would consider it, but there is nothing in the record indicating that he ever responded to the counteroffer. (*Id.*)

### G. Termination & Replacement

Tensions peaked in late April and early May 2016.  On April 29, Yousefzadeh emailed Smith, asserting that St. Paul "need[s] a Supplier Quality Engineer at this time and I cannot do my job effectively as Quality Engineer if I want to do both jobs."  (Kirkland Decl. Ex. Z [Doc. No. 76-3] at 13.)  "Therefore," Yousefzadeh stated, "effective today . . . I will no longer be able to help out as Supplier Quality Engineer for St. Paul."  (*Id.*)  He then asked Smith to notify his manager of that fact.  (*Id.*)  Just ten minutes later, however, Yousefzadeh sent a similar email to Klager, which stated that he had informed Smith that he will "no longer . . . act as Supplier Quality Engineer for [the] St. Paul site" and that he would "disregard any emails from you or other people regarding Supplier Quality Engineer" duties.  (Kirkland Decl. Ex. AA [Doc. No. 76-3] at 15.)  Later that day, he also emailed Smith asking for a "solution" to his problem because he was "dealing with a manager who is misleading almost everyone."  (Kirkland Decl. Ex. BB [Doc. No. 76-3] at 17.)

Three days later, on May 2, 2016, Yousefzadeh sent several early morning emails, one of which led to his termination.  First, at 6:41 a.m., Yousefzadeh sent another email to Smith with three paragraphs outlining his concerns and his planned actions.  (*Id.*)  In his first paragraph, he asserted that his manager, Klager, was an "untruthful person" who "misled [him] several times" and because Hill-Rom has done nothing about it, he would only communicate with Klager via email moving forward.  (*Id.*)  His second paragraph claimed that his weekly action planning meetings were being used by Klager to "harass, retaliate, mislead, and abuse" Yousefzadeh, and that Shatava (who was sitting in on the meetings) had done nothing to stop the harassment.  (*Id.*)  He explained that until he felt Hill-Rom had taken

"action against my manager and stop[ped] her from harassing, retaliating, discriminating, and abusing" him, he would only engage in those weekly meetings via email. (*Id.*) Finally, his third paragraph asserted that because Klager had required him to do a lot of deskwork, his vision had decreased substantially, and he requested "immediate action regarding" having his allotted desk time changed. (*Id.*)

Less than fifteen minutes after sending that email to Smith, Yousefzadeh emailed over 100 other Hill-Rom employees the following message:

> Dear RC Co-workers:
>
> I have been working as Quality Engineer at Hill-Rom St. Paul location for about six months. It was a very difficult decision to make regarding Hill-Rom job offer, because I had another job. During these times, I noticed my manager dislike me, changing my job responsibilities, harass, retaliate, discriminate, and abuses me due to being a Muslim, and she has a Jewish husband and Jewish connection. (sic)
>
> I brought my concerns to Hill-Rom Senior Management and requested to move to a different department, I have told "No", I asked Hill-Rom to let me go, I have told "No", but I have told by Senior Management "you can resign." (sic)
>
> The reason I am sharing this information with you all, because my manager trying getting other employees involved her action against me and using them to get what she wants. I am aware of one employee so far been misled about me and my manager got advantage of it and made a case against me. This especially applies to employees whom I am working with, because this provides an excellent opportunity for my manager to mislead and use them against me. I need to let you know that you may not fall into my manager's trap as the other employee did. (sic)

(Kirkland Decl. Ex. CC [Doc. No. 76-3] at 19 (listing recipients), 20–21 (containing message).)

Shatava became aware of Yousefzadeh's email shortly after he sent it and concluded that he had violated Hill-Rom's Equal Employment Opportunity, Non-Discrimination, and

Technology policies by sending the message. (Shatava Decl. [Doc. No. 77] at 5.) She also noted that she had previously warned him about referencing any perceived religious association with Klager or her husband. (*Id.*) After consulting with her supervisor, and the general manager of the St. Paul location, Shatava determined that Yousefzadeh's email warranted termination. (*Id.* at 6; *see also* Shatava Depo. [Doc. No. 76-1] at Dkt. 34, Depo. 83 (noting that Shatava terminated Yousefzadeh because he had repeatedly sent emails to others referencing his manager or his managers' family's religion inappropriately).) Yousefzadeh was informed that he was being terminated because of his mass email to the other Hill-Rom employees, and was discharged less than an hour after he sent the message. (Pl. Depo. [Doc. No. 76-1] at Dkt. 21, Depo. 338.) Klager was not involved in the decision to terminate Yousefzadeh, and in fact was not even aware it had happened until after Yousefzadeh had been discharged. (*Id.* at Dkt. 21, Depo. 339 (noting Klager was not even in her office when Yousefzadeh was fired); Klager Decl. [Doc. No. 79] at 7.) Before leaving, Yousefzadeh sent one final message to Klager which read: "Congratulations! You got what [you] were wishing for in the past [] few months. Majority of Jewish people are known to be against Muslims." (Kirkland Decl. Ex. EE [Doc. No. 76-3] at 49.)

On May 5, 2016, Yousefzadeh informed the EEOC about his termination and asserted that it was illegal retaliation. (*See* Kirkland Decl. Ex. Y [Doc. No. 76-3] at 2.) On May 10, 2016, Yousefzadeh received a formal letter informing him why he was dismissed. (*See* Kirkland Decl. Ex. FF [Doc. No. 76-3] at 51.) The letter stated that Yousefzadeh was terminated because on May 2, he "sent an email copying the majority of the [Hill-Rom] Respiratory Care organization" in which "you made disparaging and accusatory claims

against your Manager based on her religion or the religion of her family members, in violation of the Equal Employment Opportunity Policy, Non-discrimination and Technology policies." (*Id.*) The letter also referenced Yousefzadeh's prior "inappropriate email[s]" to Klager, Smith, Shatava, and others at Hill-Rom, and noted that he had been informed that such emails were inappropriate and would "not [be] tolerated at Hill-Rom." (*Id.*)

Following Yousefzadeh's termination, Klager hired Mitra Mahmoodi to replace him as a QA/RA Engineer. (Klager Decl. [Doc. No. 79] at 7.) Klager knew prior to hiring Mahmoodi that she was an Iranian American but knew nothing about her religious beliefs. (*Id.*) Mahmoodi testified that she was contacted in June 2016 about the position and accepted the job because she wanted to gain experience and because she had worked with Klager in the past and admired her. (Kirkland Decl. Ex. B Mahmoodi Depo. [Doc. No. 76-1] at Dkt. 27–28, Depo. 36–37.) Mahmoodi's title was "Quality Assurance Engineer", (*see id.* at Dkt. 26, Depo. 33), and she was paid approximately the same amount as Yousefzadeh, (Shatava Depo. [Doc. No. 76-1] at Dkt. 34, Depo. 84–85.) Moreover, while the record is somewhat unclear on this point, she appears to have been given a job description for the position that was substantially similar to the one provided to Yousefzadeh when he was hired. (*See* Fondungallah Decl. Mahmoodi Depo. [Doc. No. 82-1] at Dkt. 67–68, Depo. 42–43 (noting confusion over differences between a job posting versus a job description).) Mahmoodi began working for Hill-Rom on August 22, 2016. (*Id.*)

## H. Procedural Posture

On June 3, 2016, Yousefzadeh updated his EEOC complaint. (*See* Kirkland Decl. Ex. DD [Doc. No. 76-3] at 25–31.) On September 28, 2017, the EEOC issued Yousefzadeh a

"right to sue" letter. (*Id.* at 46.) On December 20, 2017, Yousefzadeh filed the present case. (*See* Compl. [Doc. No. 1].)

Yousefzadeh has brought eight claims against Hill-Rom, which can be divided into four categories based on both the underlying form of discrimination he asserts and his retaliation claims. First, he asserts that Hill-Rom engaged in religious discrimination against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), codified at 42 U.S.C. § 2000e *et. seq.* (2012) (count 1) and in violation of the Minnesota Human Rights Act ("MHRA"), codified at Minn. Stat. § 363A.01 *et. seq.* (2018) (count 2). (*See* 2d Am. Compl. [Doc. No. 34] at 7.) Second, he asserts Hill-Rom engaged in discrimination based on his national origin, in violation of Title VII (count 3) and the MHRA (count 4). (*Id.* at 8–10.) Third, Yousefzadeh claims Hill-Rom engaged in race discrimination in violation of Title VII (count 5) and the MHRA (count 6). (*Id.* at 10–11.) Finally, he asserts that Hill-Rom retaliated against him for raising his concerns about discrimination, in violation of Title VII (count 7) and the MHRA (count 8.) (*Id.* at 12–13.)

## II. DISCUSSION

A court may grant a party summary judgment if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing summary judgment " 'must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.' " *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th

Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)). A dispute of fact is "genuine" if "a factfinder could reasonably determine the issue in the non-moving party's favor." *Zayed v. Associated Bank, N.A.*, 913 F.3d 709, 714 (8th Cir. 2019) (citing *Anderson*, 477 U.S. at 248). A factfinder's determination of an issue is only reasonable if "it is based on 'sufficient probative evidence' and not on 'mere speculation, conjecture, or fantasy.' " *Id.* (citing *Williams v. Mannis*, 889 F.3d 926, 931 (8th Cir. 2018)).

## A. Applicable Law

There are two applicable laws here—Title VII of the Civil Rights Act of 1964, and the Minnesota Human Rights Act. Each is addressed in turn.

### 1. Title VII of the Civil Rights Act

Pursuant to Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice" for an employer to, among other things, "discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2012). Absent "direct evidence of discrimination,"[4] the Court analyzes Title VII discrimination claims under "the burden-shifting framework of

---

[4] Direct evidence of discrimination is evidence showing "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (citations omitted)) Consequently, the term "direct" refers to "the causal strength of the proof" itself. *Id.* Here, Yousefzadeh does not assert direct evidence of discrimination, and instead relies on indirect, or circumstantial, evidence. (*See* Pl. Mem. [Doc. No. 81] at 21.)

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)." *Stone v. McGraw Hill Fin., Inc.*, 856 F.3d 1168, 1174 (8th Cir. 2017) (internal quotation marks omitted) (citing *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012)). When claiming discrimination under Title VII, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing that "[1] he is a member of a protected class . . . [2] he met [his employer's] legitimate employment expectations, [3] [] he suffered an adverse employment action, and [4] the circumstances give rise to an inference of discrimination based on" race, national origin, or religion. *Grant v. City of Blytheville*, 841 F.3d 767, 773 (8th Cir. 2016). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer "to 'articulate a legitimate, nondiscriminatory reason' for the adverse employment action." *Stone*, 856 F.3d at 1174 (citation omitted). If the employer does so, " '[t]he burden then shifts back to [the plaintiff] to prove that the proffered reason is pretext for discrimination.' " *Id.* (citation omitted). At all times, however, the plaintiff retains the "ultimate burden of proof and persuasion." *Id.* (citation omitted) (internal quotation marks omitted).

Title VII also prohibits "retaliation on account of an employee having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 42 U.S.C. § 2000e-3(a) (2012) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter."). To establish a *prima facie* case of retaliation, the plaintiff must show "(1) [he] engaged in protected conduct, (2) [he] suffered a materially adverse employment act, and (3) the adverse act was

causally linked to the protected conduct." *Bunch v. Univ. of Ark. Bd. of Tr.*, 863 F.3d 1062, 1069 (8th Cir. 2017). "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which requires proof that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. "[T]emporal proximity alone is insufficient to demonstrate a genuine issue of material fact as to whether conduct was retaliatory." *Bunch*, 863 F.3d at 1069 (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)).

### 2. Minnesota Human Rights Act

Minnesota has enacted its own law prohibiting discriminatory employment practices and retaliation (or, as Minnesota calls it, "reprisal"). *See* Minn. Stat. §§ 363A.08, subd. 2 (2018) (prohibiting discriminatory employment practices), 363A.15 (2018) (prohibiting reprisal). Generally, "[t]he same analysis applies to both MHRA and Title VII claims." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (citing *Kasper v. Federated Mut. Ins. Co.,* 425 F.3d 496, 502 (8th Cir. 2005); *Bahr v. Capella Univ.,* 788 N.W.2d 76, 83 (Minn. 2010)); *see also Muor v. U.S. Bank Nat'l Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013) (citing *Torgerson*, 643 F.3d at 1043).

Minnesota law states that "it is an unfair employment practice for an employer, because of race, color, creed, religion, [or] national origin," among other things, "to . . . discharge an employee[] or . . . discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2(2)–(3).

With respect to reprisal, Minnesota law states that "[i]t is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a perpetrator, employer, . . . or employee or agent thereof to intentionally engage in any reprisal against any person because that person," among other things, "opposed a practice forbidden under this chapter or has filed a charge . . . ." Minn. Stat. § 363A.15. The term "reprisal" includes "any form of intimidation, retaliation, or harassment" and specifically encompasses refusal to hire, departing from customary employment practices, and transferring or assigning the individual to a lesser position in terms of wages, hours, job classification, job security, or "other employment status." *Id.*

## B. Yousefzadeh's Discrimination Claims

As noted above, in order to survive summary judgment, Yousefzadeh must establish a *prima facie* case of discrimination—whether based on his race, national origin, or religion—by showing that "[1] he is a member of a protected class . . . [2] he met [his employer's] legitimate employment expectations, [3] [] he suffered an adverse employment action, and [4] the circumstances give rise to an inference of discrimination based on" race, national origin, or religion. *Grant*, 841 F.3d at 773. The parties do not dispute that Yousefzadeh is a member of several protected classes—namely, a Muslim Iranian American. (*Compare* Hill-Rom Mem. [Doc. No. 75] at 22, *with* Pl. Mem. [Doc. No. 81] at 22.) In addition, it appears that neither party contests that Yousefzadeh suffered an adverse employment action: his termination. (*Compare* Hill-Rom. Mem. [Doc. No. 75] at 22 n.4, *with* Pl. Mem. [Doc. No. 81] at 22–25 (generally arguing that the adverse employment action was "termination" in addition to shifting treatment at work).) Consequently, the only two elements in dispute are

whether Yousefzadeh was meeting Hill-Rom's legitimate job expectations (element two), and whether the circumstances give rise to an inference of discrimination based on race, religion, or national origin (element four). With respect to the fourth element, Yousefzadeh argues that the circumstances giving rise to an inference of discrimination stem from the disparate treatment he received compared to a purportedly-similarly-situated co-worker, Bob Whittemore.[5] The Court addresses each element in turn.

### 1. Yousefzadeh Was Not Meeting Hill-Rom's Legitimate Job Expectations

The parties dispute whether Yousefzadeh was meeting Hill-Rom's legitimate job expectations. Hill-Rom argues that throughout his employment, Yousefzadeh "repeatedly failed to meet Hill-Rom's performance expectations" despite repeated efforts to coach him. He was regularly insubordinate to Klager, repeatedly refused to accept that Klager (as his manager) had the ability to assign him tasks, and resisted any responsibilities related to document control or supplier quality engineer duties. (Hill-Rom Mem. [Doc. No. 75] at 23–24.) Hill-Rom also asserts that Yousefzadeh repeatedly violated Hill-Rom policies by sending "hostile emails criticizing Klager as a manager that conspicuously referred to what he perceived as her 'Jewish connection'." (*Id.* at 24.) In addition, Hill-Rom points out that Yousefzadeh was warned that continuing to reference his manager's perceived religion was inappropriate. (*Id.*)

---

[5] Alternatively, because Yousefzadeh was terminated, Hill-Rom notes that one alternate path in proving the fourth element of a discrimination claim is to show that he was replaced by a nonmember of his protected class. *See Smith v. DataCard Corp.*, 9 F. Supp. 2d 1067, 1079 (D. Minn. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802). Yousefzadeh does not advance that argument for good reason: his replacement was a practicing Muslim woman who is also Iranian American. (*See* Klager Decl. [Doc. No. 79] at 7.)

Yousefzadeh argues in response that there is enough evidence to support a factfinder's reasonable determination of the question in his favor. He asserts that he was qualified for the position because he is an industrial engineer holding various degrees in the field. (Pl. Mem. [Doc. No. 81] at 22.) He also asserts that he was hired for the position, indicating his qualifications. (*Id.* at 22–23.) In Yousefzadeh's words, he admits that he "had issues with his job assignments not related to his position as a quality engineer" but contends that other "evidence" shows that his performance was satisfactory. (*Id.* at 23.) Specifically, Yousefzadeh points to the fact that he "assisted Klager with an audit and for that Klager took [him] out to lunch." (*Id.*) He also contends that he was "ahead of everyone else" on document control duties and "in April was already doing work that was scheduled to be completed in June." (*Id.*) Finally, he asserts that in late April, Shatava reported to Smith that Klager had said that Yousefzadeh had recently been "much more willing to take directions from her and 'that is good news[.]' " (*Id.*)

No reasonable juror could find that Yousefzadeh was meeting Hill-Rom's legitimate job expectations. As an initial matter, his reliance on the fact that he is an engineer and was hired by Hill-Rom does not demonstrate that *while employed* at Hill-Rom, he met the company's reasonable job expectations.

Beyond his credentials and the fact of his hire, the specific evidence Yousefzadeh relies on is wholly insufficient to allow a factfinder to reasonably conclude that he was meeting Hill-Rom's reasonable job expectations. *Zayed*, 913 F.3d at 714 (citation omitted). From the beginning, Yousefzadeh was informed that the QA/RA Engineer would be responsible for a wide range of tasks because the position was new to the St. Paul site.

33

(*See* Klager Decl. [Doc. No. 79] at 2–3.) Indeed, Klager informed Yousefzadeh during his interview that because the position was new, the person selected for the position would be responsible for job responsibilities that were "not yet fully established." (*Id.* at 2.) With respect to specific job responsibilities, it is undisputed that Klager expected the QA/RA Engineer to "work with individuals throughout the St. Paul site to facilitate [CAPA] processes, including . . . identify[ing] the cause of non-conformities and other quality issues," as well as "planning corrective actions to address the root causes identified, and reviewing and assessing the implementation and effectiveness of those corrective actions." (*Id.* at 3.) She also expected that the engineer would handle "supplier quality responsibilities[,] . . . [and] track various quality metrics throughout the facility . . . under minimal supervision." (*Id.*) Indeed, the job description provided to Yousefzadeh indicates that, among other duties, the QA/RA Engineer would be responsible for "[l]ead[ing] or support[ing] *any required Quality Improvement activities* in St. Paul[.]" (Kirkland Decl. Ex. D [Doc. No. 76-1] at 36 (emphasis added).) As noted above, this included document control change duties—a temporary project stemming from Hill-Rom's recent shift in manufacturing from South Carolina to Minnesota.

From the beginning, Yousefzadeh simply failed to meet Hill-Rom's expectations regarding these responsibilities. Klager developed significant concerns about Yousefzadeh's performance shortly after he was hired. (*See* Klager Decl. [Doc. No. 79] at 4.) She noted that his "completed" document control assignments were done "very slowly" and filled "with numerous errors." (*Id.* at 4–5.) Moreover, throughout the document control project, Klager reports that Yousefzadeh repeatedly questioned her authority to

34

review and reject the documents even though Klager was his direct supervisor. (*Id.* at 4–5.) Klager informed Yousefzadeh that he was not meeting her expectations. (Pl. Depo. [Doc. No. 76-1] at Dkt. 15, Depo. 177). Yousefzadeh admits that he does not "learn things as fast as other people," and that it was within Klager's right to criticize him for his performance issues, (*id.*) but contends that he was "ahead" on document control duties, (*see* Pl. Mem. [Doc. No. 81] at 23 (citing a February 2016 status report on Yousefzadeh's work assignments).) However, even assuming he was ahead and that being ahead exceeded his job expectations—which, for summary judgment purposes, this Court must— Yousefzadeh offers no evidence to rebut Klager's contention that his "completed" document control assignments were done "very slowly" and filled "with numerous errors." (Klager Decl. [Doc. No. 79] at 4–5.) Similarly, Yousefzadeh offers no explanation—and one does not appear in the record—for his repeated insubordination after being told that he was responsible for participating in document control change projects. (*Id.* at 4–5.) Yousefzadeh's continued resistance to document control changes is even more telling considering his own admission that there was "absolutely" nothing wrong with Klager asking him to take on new tasks—like document control—so long as the requests were not discriminatory. (Pl. Depo. [Doc. No. 76-1] at Dkt. 16, Depo. 188.)

Yousefzadeh asserts that any performance issues he may have had were only related to "job assignments not related to his position as a quality engineer," such as document control changes and supplier quality duties. (Pl. Mem. [Doc. No. 81] at 23.) That claim, however, is simply a continuation of Yousefzadeh's repeated assertions during his time at Hill-Rom that he should not be responsible for supplier quality and document control

change duties because they were not explicitly listed in his job description. (*See* Pl. Depo. [Doc. No. 76-1] at Dkt. 16, 187–188 (arguing that document control was not something he had ever done before and was not what he was hired to do).) However, he acknowledged in his deposition that the job duties listed in his job description were not exclusive, (*see* Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at 8–9, Depo. 84–85), and was informed many times throughout his employment that his job encompassed document control changes and supplier quality duties, (*see* Klager Decl. [Doc. No. 79] at 5; Kirkland Decl. Ex. N [Doc. No. 76-2] at 20–21 (summarizing Yousefzadeh's job duties and the amount of time each week he should be spending on each specific responsibility).) He also received numerous trainings on document control, as reflected in his Hill-Rom training records. (*See* Shatava Decl. Ex. A [Doc. No. 77-1] at 2–10.) Document control duties were a required—albeit, temporary—part of his job, and Yousefzadeh's bare assertions to the contrary lack any record support and therefore cannot establish a genuine issue of material fact for summary judgment purposes. *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 811 n.3 (8th Cir. 2008) (citation omitted) ("[B]are assertion and speculation as to [a supervisor's] motive does not create a genuine issue of material fact."); *see also Mathis v. Mathes*, 170 Fed. App'x 985, 985 (8th Cir. 2006) (citations omitted) ("[B]are assertions— without the support of exhibits, affidavits or sworn statements—do not establish a genuine issue of material fact.").

Yousefzadeh also relies on a "thank you" lunch provided by his manager just after being hired, and a single email in late April 2016, as evidence that he was meeting Hill-Rom's reasonable job expectations. He asserts that Klager's "thank you" lunch for helping

with an audit is evidence he was doing his job well.  (Pl. Mem. [Doc. No. 81] at 23.)  Yet even considering that fact in the light most favorable to Yousefzadeh, a single thank-you lunch at the *beginning* of his employment (in November 2015) is insufficient to raise a genuine dispute of material fact about his ensuing performance issues over the next six months (from December 2015 through April 2016).  Klager began working with HR in December 2015—after the thank-you lunch—regarding her concerns with Yousefzadeh's performance.  (Klager Decl. [Doc. No. 79] at 5–6.)  She attempted to coach Yousefzadeh from that point on, but he apparently resisted those efforts; indeed, Klager was surprised to find that someone with Yousefzadeh's experience required such extensive step-by-step training.  (*Id.*)  Problems continued into January 2016, when Shatava noted that Yousefzadeh should have been further along in performing his duties adequately but that he was exhibiting "clear performance gaps after three months on the job that were not sufficiently explained by any lack of training[.]"  (Shatava Decl. [Doc. No. 77] at 4.)

In early February, Klager again informed Yousefzadeh that his performance was inadequate and sent him an email with a detailed list of her expectations and a summary of the time he should spend on each of his duties.  (Kirkland Decl. Ex. N. [Doc. No. 76-2] at 20.)  After his performance did not improve, she met with him again to have a "performance conversation" and placed him on a Performance Improvement Plan, which explicitly states that Yousefzadeh's performance "as a Quality Engineer of the Hill-Rom Co., Inc. is unacceptable" and that the plan was designed to "raise [Yousefzadeh's] performance to an acceptable level."  (Shatava Decl. Ex. D [Doc. No. 77-1] at 19; Kirkland Decl. Ex. S PIP Mem. [Doc. No. 76-2] at 39.)  Yousefzadeh disagreed with the plan and refused to sign it.

(Shatava Decl. Ex. D. [Doc. No. 77-1] at 19.)  For the rest of the month, Yousefzadeh continued to email HR about being assigned inappropriate job duties, (*see* Fondungallah Decl. Ex. 12 [Doc. No. 82-3] at 5–6.), and reiterated those concerns during an in-person meeting with Reif and Cousins, (Reif Decl. Ex. C. [Doc. No. 78-1] at 11–13.)  He admitted that during this time, however, that Klager had been showing him how to do things but asserted that those demonstrations were "not adequate" for him.  (*Id.* at 12.)

In March 2016, Smith (the Vice-President of Human Resources) informed Yousefzadeh that after personally investigating his concerns, he found no evidence of discrimination or animus.  (Kirkland Decl. Ex. V [Doc. No. 76-2] at 49.)  He also informed Yousefzadeh that he had been provided training where applicable, that supplier quality duties were a part of his job, and that he would not be given a new manager.  (*Id.* at 49–50.)  In late April, Yousefzadeh informed Smith and Klager that he would no longer perform any Supplier Quality engineer responsibilities.  (*See* Kirkland Decl. Exs. Z & AA [Doc. No. 76-3] at 13, 15.)  And in early May, he outright refused to communicate with his manager in any form other than email and refused to continue with in-person one-on-one meetings between himself, Klager, and Human Resources.  (Kirkland Decl. Ex. BB [Doc. No. 76-3] at 17.)  A single "thank you" lunch that preceded these issues by several months does not create a genuine dispute of material fact.

Similarly, Yousefzadeh's reference to a single April 2016 email from Shatava to Smith stating that Yousefzadeh was now "more willing to take direction from [Klager]" also fails to raise a genuine dispute of material fact.  The email's language, taken out of context of the preceding several months of issues, might sound like a possible uptick in

performance. (Fondungallah Decl. Ex. 25.) However, statements that are "taken out of context" do not create a question of material fact when the statements, taken in context, establish them to be "isolated comments." *See Burroughs v. City of Springfield*, 163 F.3d 505, 508 (8th Cir. 1998). Here, the April 2016 email referenced by Yousefzadeh came after months of performance issues and says nothing about Yousefzadeh meeting Hill-Rom's performance expectations. In fact, even considering the email in a light most favorable to Yousefzadeh, it indicates Yousefzadeh *may* have been improving one aspect of his performance expectations (taking direction from a supervisor); it does not establish that he was in fact performing at the level expected by Hill-Rom. Furthermore, the email's existence is evidence of the fact that Yousefzadeh's performance was, up to that point, deficient. Indeed, that email would not have been necessary if Yousefzadeh was already meeting Hill-Rom's expectations because there would have been no need to inform the Vice President of Human Resources that an employee was "more willing" to take direction from his supervisor.

In summary, the evidence in the record overwhelmingly shows that Yousefzadeh was not meeting Hill-Rom's reasonable expectations regarding his job duties. Any of Yousefzadeh's citations to the contrary are either taken out of context or mere continuations of a misunderstanding—or perhaps disagreement—Yousefzadeh had about his job responsibilities. Moreover, there is simply no evidence in the record establishing any retaliatory motive for Hill-Rom's critique of Yousefzadeh's performance, which means the Court will not "second-guess [Hill-Rom's] judgment of [its] employee's performance." *Fercello v. County of Ramsey*, 612 F.3d 1069, 1080 (8th Cir. 2010) (citing

*Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 916 (8th Cir. 2007) (noting that the federal courts do not sit as "super-personnel departments reviewing the wisdom and fairness of the business judgments . . . except [where] those judgments involve intentional discrimination" (citation omitted) (internal quotation marks omitted))).   Accordingly, Yousefzadeh has failed to establish a genuine dispute of material fact over whether he met Hill-Rom's reasonable job expectations.

**2. Nothing In The Record Gives Rise To An Inference Of Discrimination Because There Is No Evidence That Similarly Situated Individuals Were Treated Differently Than Yousefzadeh.**

To establish element four of his *prima facie* case of discrimination, Yousefzadeh argues that an inference of discrimination arises out of the disparate treatment he received compared to his co-worker, Bob Whittemore.  (Pl. Mem. at 23.)  Specifically, he argues that both he and Whittemore were hired in October 2015 by Klager, and that he is Asian, while Whittemore is Caucasian.  (*Id.* at 24.)  He asserts that their titles were similar: Whittemore was hired as a "quality assurance and regulatory affairs technician" while he was hired as a "quality assurance and regulatory affairs (sic)."[6]  (*Id.*)  Additionally, Yousefzadeh asserts that both he and Whittemore were doing the same job: "document control."  (*Id.*)  In terms of disparate treatment, Yousefzadeh argues that he did not receive certain trainings that Whittemore did receive, and that unlike him, Whittemore was never subject to a PIP or an

---

[6]     The sentence in Yousefzadeh's memorandum in opposition to summary judgment containing this language appears to be missing the word "engineer," Yousefzadeh's formal title.  It is unclear to the Court whether the omission was inadvertent or intentional.  In any event, as is noted below, Yousefzadeh's job title (and its accompanying responsibilities and requirements) is critical to the "similarly-situated persons" analysis.

Action Plan, much less weekly reporting requirements, despite also making some errors in document control duties.  (*Id.* at 24–25.)

For its part, Hill-Rom argues that Yousefzadeh cannot establish that Whittemore is a similarly situated person because Yousefzadeh and Whittemore held different jobs (QA/RA Engineer and QA/RA Technician, respectively) with different levels of supervisions and responsibility, and because Whittemore never sent "similarly offensive emails denigrating and demeaning [his] supervisor's religion or religious association in violation of multiple company policies."  (Hill-Rom Mem. [Doc. No. 75] at 24–25.)

At the prima facie stage, Yousefzadeh "must proffer 'specific, tangible evidence' that [Whittemore] was 'similarly situated in all relevant respects, including that the offenses [purportedly committed by the other employee] were of the same or comparable seriousness.' "  *Rinchuso v. Brookshire Grocery Co.*, 944 F.3d 725, 725 (8th Cir. 2019) (citations omitted).  "An unsupported, self-serving allegation that another employee was similarly situated is insufficient."  *Id.* (citing *Fatemi v. White*, 775 F.3d 1022, 1040 (8th Cir. 2015)).

The Court holds that Yousefzadeh has failed to raise a genuine dispute of material fact showing an inference of discrimination based on race, religion, or national origin based on disparate treatment.  Two independent reasons support this conclusion.  First, contrary to Yousefzadeh's assertions, Whittemore and Yousefzadeh held different jobs and were subject to different standards, and accordingly were not "similarly situated."  Bob Whittemore was hired as a QA/RA Technician, which Yousefzadeh admits is a position ranked below a QA/RA Engineer.  (Pl. Depo. [Doc. No. 76-1] at Dkt. 18, Depo. 225.)  Moreover, Klager

noted in her declaration that the QA/RA Technician position is in fact a "lower level position" that—unlike the QA/RA Engineer position—does not require that the employee have an engineering degree. (Klager Decl. [Doc. No. 79] at 2.) Yousefzadeh, on the other hand, was a QA/RA Engineer, and was expected to "require less management and supervision than the technician role." (*Id.* at 2, 3 (noting that the QA/RA Engineer was expected to complete his tasks "under minimal supervision").) As such, the QA/RA Technician was responsible for "more routine tasks" than the QA/RA Engineer, "which . . . required less expertise." (*Id.* at 3.) Klager expected that the technician would require "closer supervision and guidance than the QA/RA Engineer." (*Id.*) Ultimately, Whittemore held a different job with different responsibilities and was subject to different standards (i.e., more supervision and guidance was expected), which undermines Yousefzadeh's claim that he and Whittemore were "similarly situated."[7] *See Rinchuso*, 944 F.3d at 725.

Second, there is no evidence in the record that Whittemore engaged in the same kind of misconduct that Yousefzadeh engaged in, but received less or no discipline from Hill-Rom. There is no evidence in the record showing that Whittemore ever sent an email to over 100 other employees harassing his manager and warning them to not listen to her; indeed, there is simply no evidence that Whittemore did anything that violated Hill-Rom policy. Therefore, Yousefzadeh has also failed to establish that Whittemore committed " 'offenses [that] were

---

[7]     The fact that Yousefzadeh and Whittemore were occasionally working on the same projects at the same time does not render them similarly situated in all respects. *Rinchuso*, 944 F.3d at 725.

of the same or comparable seriousness' " yet received lesser punishment. *Rinchuso*, 944 F.3d at 725 (citations omitted).

There is essentially no evidence in the record giving rise to an inference of discrimination based on race, religion, or national origin beyond Yousefzadeh's bare assertions and his eventual termination. Yousefzadeh admits that the only person who *ever* mentioned his race, religion, or national origin—and even then, in the form of a question and not an affirmative statement—was Klager during their November 2015 lunch, and that no one ever mentioned it at any other time during his employment. (Pl. Depo. [Doc. No. 76-1] at Dkt. 9, Depo. 121–123; *see also id.* at Dkt. 15, Depo. 177–180.) There is no direct evidence of discrimination in the record either. And while Yousefzadeh was subjected to disciplinary plans, weekly reporting requirements, purportedly-expanded job responsibilities, and purported "attitude shifts", as is discussed within Yousefzadeh's retaliation/reprisal claims, *infra* at § II(C)(2)(a)–(b), none of those events constituted an adverse employment action. Similarly, his eventual termination—discussed below in his retaliation/reprisal claims, *infra* at § II(C)(1)(c)—also fails to give rise to an inference of discrimination because his own harassing conduct led to his termination and severed any inference that could be derived from the temporal proximity of his termination to his complaints of discrimination. Ultimately, there are no similarly situated persons against which to measure the treatment Yousefzadeh received, no evidence of discrimination (direct or indirect) in the record, and no evidence that his eventual termination was based on illegitimate criteria. Accordingly, Yousefzadeh has also failed to make a *prima facie* showing of element four of his discrimination claims.

In summary, Yousefzadeh has failed to establish any genuine disputes of material fact over two of the four elements required to establish a *prima facie* case of discrimination under either Title VII or the MHRA. There is no evidence in the record showing any discrimination against him on the basis of race, national origin, or religion, and, as noted below, Hill-Rom possessed a valid non-discriminatory reason for terminating Yousefzadeh that cannot be shown to be pretextual. Accordingly, the Court grants summary judgment in favor of Hill-Rom on counts one through six.[8]

### C. Yousefzadeh's Retaliation/Reprisal Claims

The Court now turns to Yousefzadeh's retaliation and reprisal claims. As discussed above, to survive summary judgment on those claims, Yousefzadeh must establish a *prima facie* case of retaliation by showing that "(1) [he] engaged in protected conduct, (2) [he] suffered a materially adverse employment act, and (3) the adverse act was causally linked to the protected conduct." *Bunch*, 863 F.3d at 1069. The causation element must be proved "according to traditional principles of but-for causation," which requires proof that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. Temporal proximity alone is generally "insufficient to demonstrate a genuine issue of material fact as to whether conduct was retaliatory." *Bunch*, 863 F.3d at 1069 (citing *Kiel*, 169 F.3d at 1136). If a plaintiff establishes

---

[8]  Because Yousefzadeh has failed to establish a *prima facie* case of discrimination, the Court does not reach the later stages of the *McDonnell* burden-shifting framework. *See Barker v. Mo. Dep't of Corr.*, 513 F.3d 831, 835 n.4 (8th Cir. 2008) (noting that if a plaintiff fails to make out a *prima facie* case of discrimination, the court need not address the other aspects of the burden-shifting framework).

a *prima facie* case of retaliation, the burden shifts to the defendant to produce a nondiscriminatory reason for the adverse employment action. *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (citation omitted). If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was pretextual. *Id.*

Hill-Rom admits that Yousefzadeh can satisfy the first element of his *prima facie* case because he filed an EEOC charge and reported perceived discrimination by his manager during his employment. (Hill-Rom Mem. [Doc. No. 75] at 28.) With respect to adverse employment actions, Hill-Rom acknowledges that Yousefzadeh was terminated, but argues that his complaints of unfair conduct and other aspects of his employment were not protected conduct because most of them did not involve any protected class status. (*Id.* at 29.) Moreover, Hill-Rom asserts that Yousefzadeh's May 2 email was *not* protected conduct, and therefore his termination after sending that email does not establish the inference of a causal link between his termination and protected conduct because the email was an intervening, superseding unprotected event warranting dismissal. (*Id.* at 29–30.)

In response, Yousefzadeh argues that in addition to filing an EEOC charge and reporting perceived discrimination, his May 2 email to over 100 Hill-Rom employees was protected conduct, and that because he was terminated for sending that email, he has established a *prima facie* case of retaliation and reprisal. (Pl. Mem. [Doc. No. 81] at 16, 18.) Beyond the May 2 email, Yousefzadeh asserts that Klager's "change" in attitude after learning about Yousefzadeh's religion, race, and national origin—and his alleged OSHA and EEOC complaints—constituted an adverse employment action. (*Id.* at 16.) Specifically, he asserts that Klager impermissibly altered his job responsibilities, forced him to use his paid-time off

when he was out of the office, subjected him to weekly reporting requirements, placed him on a performance improvement plan, and later, an action plan. (*Id.* at 17.)

Because Yousefzadeh has asserted two different bases for his retaliation claims—Yousefzadeh's May 2 email and changes at work—the Court addresses each separately.

### 1. Retaliation/Reprisal Based on Yousefzadeh's May 2 Email

The Court first addresses whether Yousefzadeh's claims regarding his May 2 email to over 100 other Hill-Rom employees set forth a *prima facie* case of retaliation. For the reasons discussed below, the Court holds that (1) Yousefzadeh has established a *prima facie* case of retaliation based on that May 2 email; (2) Hill-Rom has offered a legitimate non-discriminatory reason for terminating Yousefzadeh related to that email; and (3) Yousefzadeh fails to raise any genuine dispute of material fact that Hill-Rom's stated reason was pretextual. Accordingly, Yousefzadeh has failed to raise a genuine dispute of material fact for trial regarding any retaliation or reprisal based on his May 2 email.

### a. Yousefzadeh's May 2 Email

Hill-Rom admits that Yousefzadeh's EEOC complaint and his various reports of discrimination to his managers and other Hill-Rom HR individuals were protected conduct. (*See* Hill-Rom Mem. [Doc. No. 75] at 28.) The only dispute with respect to element one is whether Yousefzadeh's May 2 email also constitutes protected conduct. For the reasons discussed below, the Court holds as a matter of law that the complaints contained within Yousefzadeh's May 2 email may well be protected conduct, but the harassing manner in which the email was written and distributed is fair grounds for termination as a violation of company policy.

Title VII and the MHRA prohibit employers from "retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII ('the opposition clause'), or participating in an investigation under Title VII ('the participation clause')." *Hunt*, 282 F.3d at 1028 (citing *Brower v. Runyon*, 178 F.3d 1002, 1005 & n.3 (8th Cir. 1999)). Yousefzadeh's May 2 email must be considered under the "opposition clause" because it opposes what Yousefzadeh perceived to be unlawful employment discrimination, namely changes in job responsibilities, harassment, retaliation, discrimination, and abuse due to his status as a "Muslim" and his manager's "Jewish Husband and Jewish connection." (*See* Kirkland Decl. Ex. CC [Doc. No. 76-3] at 20.)

The Eighth Circuit has interpreted the opposition clause broadly. Indeed, in order to prevail on a retaliation claim, a plaintiff " 'need not establish the conduct which [he] opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying conduct violated the law.' " *Foster v. Time Warner Entm't Co., L.P.*, 250 F.3d 1189, 1195 (8th Cir. 2001) (quoting *Buettner v. Arch Coal Sales, Co.*, 216 F.3d 707, 714 (8th Cir. 2000)). The Supreme Court has noted—in accordance with the EEOC's compliance manual—that an employee's communication to her employer regarding a "belief that the employer has engaged in . . . a form of employment discrimination . . . [is] virtually always" opposition to the employer's activity under Title VII. *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009); *see also Federal Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008) (explaining that the EEOC compliance manual reflects a body of experience and informed judgment that

courts and litigants may rely upon).  To that end, "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000), *cert. denied* 531 U.S. 1052 (2000).  Protected activity in the form of a complaint "may be made by anyone and *it may be made to a co-worker*, newspaper reporter, or anyone else about alleged discrimination against oneself or others . . . ."  *Id.* (emphasis added) (citing *EEOC Compliance Manual* (CCH) ¶ 8006); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012) (citing *Johnson*, 215 F.3d at 580).  Accordingly, a complaint of unlawful discrimination practice made to another coworker can constitute protected conduct if made in good faith.  *See McElroy v. Am. Family Ins.*, 630 Fed. App'x 847, 851 (10th Cir. 2015) (noting that "[t]o succeed . . . [Plaintiff] must first establish his complaints to [other employees] constituted protected conduct" which occurs if the opposition "to an employer's conduct . . . opposed a practice made unlawful by Title VII . . . ." (citations omitted)).

Here, Yousefzadeh emailed other coworkers complaining of unlawful employment activities—namely, discrimination on the basis of religion.  (*See* Kirkland Decl. Ex. CC [Doc. No. 76-3] at 20.)  Such complaints are protected so long as Yousefzadeh held a good faith reasonable belief that the conduct he opposed was unlawful.  The Court is less sure about whether Yousefzadeh's belief was in fact in good faith.  However, at the summary judgment stage, the Court views the facts in the light most favorable to Yousefzadeh and therefore concludes that it must give him the benefit of the doubt as to his belief.  *See Grinnell Mut. Reinsurance Co.*, 685 F.3d at 700.  Accordingly, the complaints contained

in Yousefzadeh's May 2 email are a protected communication, and satisfy element one of his *prima facie* case of retaliation.

### b. There Is No Genuine Dispute of Fact that Yousefzadeh Suffered An Adverse Employment Action Causally Linked To His May 2 Email

Yousefzadeh was terminated on May 2, 2016. (*See* Kirkland Decl. Ex. FF [Doc. No. 76-3] at 51.) His termination letter, sent to him on May 10, 2016, indicated that he was fired for sending his May 2 email to the majority of Hill-Rom's Respiratory Care organization in which he made "disparaging and accusatory claims against [his] Manager based on her religion or the religion of her family members." (*Id.*) It also stated that he had been previously warned about sending similar emails to other individuals and that such emails were inappropriate and would not be tolerated. (*Id.*)

"Termination is an adverse employment action." *Sellner v. MAT Holdings, Inc.*, 859 F.3d 610, 614 (8th Cir. 2017) (citation omitted). Moreover, Hill-Rom explicitly stated that Yousefzadeh was terminated for his May 2 email, although as discussed below, its reason for termination is not his complaint of allegedly unlawful activity. (Kirkland Decl. Ex. FF [Doc. No. 76-3] at 51.) Hill-Rom's stated reason for termination gives rise to a causal inference (and indeed, even direct evidence) that the adverse act—Yousefzadeh's termination—was linked to the protected activity contained with his email. Accordingly, with respect to his termination, Yousefzadeh has established elements two and three of his *prima facie* case.

### c. Hill-Rom Has Provided A Legitimate Non-Discriminatory Basis For Terminating Yousefzadeh, and Yousefzadeh Cannot Show Pretext

Because Yousefzadeh established a *prima facie* case of retaliation, the burden shifts to Hill-Rom to produce a nondiscriminatory reason for terminating Yousefzadeh. *Hunt*, 282 F.3d at 1028 (citation omitted). Hill-Rom has done so: it asserts that Yousefzadeh's email disparaged his manager—by asserting that she was abusing and harassing him based on his religion—to over 100 other employees (none of which were related to his prior complaints or concerns) in violation of its EEO, nondiscrimination, harassment, and technology policies (*See* Hill-Rom Mem. [Doc. No. 75] at 25–26.); *Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006) (noting that employee's violation of company policy was a "legitimate, nondiscriminatory reason" for terminating the employee). A review of Hill-Rom's policies— which Yousefzadeh acknowledged receiving—indicates that Hill-Rom forbids harassment, and that "[d]iscriminatory or harassing remarks, slurs or jokes will not be tolerated." (Kirkland Decl. Ex. H [Doc. No. 76-2] at 5.) Any Hill-Rom employee who has engaged in harassment is "subject to disciplinary action, up to and including unpaid suspension or termination." (*Id.* at 7.) Moreover, all of Hill-Rom policies, rules and guidelines apply to employee use of Hill-Rom's email systems, "including, but not limited to, policies regarding harassment, discrimination, ethics, code of conduct and confidentiality/non-disclosure." (Kirkland Decl. Ex. I [Doc. No. 76-2] at 9.) A violation of company policy constitutes a legitimate nondiscriminatory reason for termination.

Because Hill-Rom has provided a valid nondiscriminatory reason for terminating Yousefzadeh based on his May 2 email, the burden shifts back to him to show that Hill-Rom's

reason is mere pretext for intentional discrimination. *See Hunt*, 282 F.3d at 1028 (citation omitted). This burden is heavier than the showing required to establish a *prima facie* case: "[a]n employee's attempt to prove pretext or actual discrimination requires more substantial evidence . . . because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001) (citation omitted). Indeed, "[a]n employee who engages in protected activity is not insulated from adverse action for violating workplace rules, and an employer's belief that the employee committed misconduct is a legitimate, non-discriminatory reason for adverse action." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008) (citing *Kiel*, 169 F.3d at 1136).

Yousefzadeh argues that Hill-Rom's stated reason for termination—violation of company policy—is pretext because there is no evidence in the record to show that Yousefzadeh was informed that his prior emails to Klager, Smith, and others were inappropriate, and that Hill-Rom has not shown how Yousefzadeh's email violated its policies. (Pl. Mem. [Doc. No. 81] at 18–19.) Moreover, he asserts that his statements that Klager was harassing, retaliating, discriminating, and abusing him because of her "Jewish husband" and "Jewish connection" did not disparage her because she did not complain about it, and that nothing in Hill-Rom's policies bars him from saying what he did. (*Id.* at 19.)

These assertions are borne out by the record. First, Hill-Rom did in fact inform Yousefzadeh that it was inappropriate to constantly accuse his manager of being discriminatory in emails sent to other co-workers, as well as to continually reference any perceived religious association between Klager and her husband. (*See* Shatava Decl. [Doc.

No. 77] at 5; *see also* Shatava Depo. [Doc. No. 76-1] at Dkt. 34, Depo. 83 (noting that Shatava terminated Yousefzadeh because he had repeatedly sent emails to others referencing his manager or his managers' family's religion inappropriately).) Second, as noted above, Hill-Rom's policies expressly forbid making discriminatory or harassing remarks based on religion, including while using Hill-Rom's technology. (*See* Kirkland Decl. Ex. H [Doc. No. 76-2] at 5; Kirkland Decl. Ex. I [Doc. No. 76-2] at 9.) Yet that is exactly what Yousefzadeh's May 2 email does. Third, the fact that Klager did not complain about Yousefzadeh's email does not diminish the harassing nature of his comments: the email accuses his manager of discrimination because of her husband's religion, a claim he then distributed to over 100 other Hill-Rom employees who apparently had nothing to do with Yousefzadeh, Klager, or any aspect of the St. Paul facility.

Contrary to Yousefzadeh's assertions, there is simply "no evidence of conduct or statements that would permit a reasonable jury to find that" Hill-Rom fired Yousefzadeh because of discriminatory animus. *Kiel*, 169 F.3d at 1136. In fact, the evidence overwhelmingly indicates the opposite. Klager, the person who purportedly harbored discriminatory animus against Yousefzadeh, *was not involved in, or even aware of*, the decision to terminate Yousefzadeh based on his email until after it had occurred. (*See* Pl. Depo. [Doc. No. 76-1] at Dkt. 21, Depo. 339 (noting Klager was not even in her office when Yousefzadeh was fired); Klager Decl. [Doc. No. 79] at 7.) Consequently, as Yousefzadeh admits, the *only* person who ever engaged in purportedly discriminatory conduct towards him was not involved in his termination decision at all. (*See* Pl. Depo. [Doc. 76-1] at Dkt. 9, Depo. 121–123; *see also id.* at Dkt. 15, Depo. 177–180.)

Additionally, while it is certainly true that mere disbelief of an employee's complaints of discrimination does not permit termination when further complaints are made, *see Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005), the protected complaints contained in Yousefzadeh's May 2 email cannot shield Yousefzadeh from termination when the harassing *manner* in which he made his complaints was both disruptive and clearly violated company policy.

The Eighth Circuit has discussed this principle several times. In *Garrett v. Mobil Oil Corp.*, for example, the Court addressed whether, under a Title VII retaliation claim, the termination of an employee who engaged in disruptive conduct while making workplace complaints constituted a valid non-pretextual decision for termination. 531 F.2d 892, 895–96 (8th Cir. 1976), *cert. denied* 429 U.S. 848 (1976). The employee at issue had engaged in disruptive conduct several times while making her complaints of race discrimination, including leaving her workstation without permission, refusing to leave a supervisors' office, and barging in on other meetings. *Id.* at 894–95. The Eighth Circuit noted that "[c]ertainly an employer can fire a worker who refuses to obey reasonable regulations, leaves the work area without permission, and barges in on conferences and meetings of managerial personnel." *Id.* at 895–96. Indeed, the Court held, the fact that the disruptive conduct was neither illegal nor damaging was irrelevant because "[a]ctions which are neither illegal nor physically damaging to persons and property may [nevertheless] be disruptive, and constitute valid reason for discharge." *Id.* at 896; *see also E.E.O.C. v. Shoney's Inc.*, 536 F. Supp. 875, 878 (N.D. Ala. 1982) ("[T]he employee's right to express his grievance must be balanced against the employer's right to operate his business." (citation omitted)).

Similarly, in *Jackson v. St. Joseph State Hospital*, the Court noted that even where a manager is the one complaining of discrimination, the employee's "conduct in pursuing [a statement from a subordinate] . . . [in a] highly offensive and disruptive manner after repeated warnings that he needed to change the way in which he dealt with subordinates" was a valid basis for dismissal. 840 F.2d 1387, 1390 (8th Cir. 1988), *cert. denied*, 488 U.S. 892 (1988). Indeed, the Court noted that "[t]o require the [employer] to overlook [the employee's] past simply because he filed a[] . . . complaint would unduly hamper the [employer's] right to make employment decisions." *Id.* Put another way, "Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers." *Id.* at 1391.

Finally, in *Kiel*, the Eighth Circuit considered the case of a deaf employee who had asked, on several occasions, that his employer purchase a telecommunications device (TDD) that would allow him to make business and personal telephone calls while at work. 169 F.3d at 1134. His employer refused because he did not need it to perform his duties as a billing clerk. *Id.* Eventually, when found photocopying a letter that again asked for a TDD and being the company would not purchase the device, the employee became "[v]isibly frustrated and upset," shouted at the co-owner of the company, "slammed his desk drawer," and walked away while making "a remark about [the co-owner's] recent purchase of a new automobile." *Id.* The employee was terminated for insubordination shortly after the outburst. *Id.* Affirming summary judgment for the employer, the Court noted while "contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes *do not*

*insulate* an employee from discipline for violating the employer's rules or disrupting the workplace." *Id.* at 1136. To that end, the Court held that while the employee's "requests for a TDD were protected communications . . . [i]nsulting [the co-owner of the company] and indulging in an angry outburst in the presence of co-workers . . . were certainly not, for the ADA confers no right to be rude." *Id.* at 1136. The employee's "intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and termination." *Id.*

Yousefzadeh's May 2 mass email falls neatly into the same category of conduct discussed in *Garett*, *Jackson*, and *Kiel*, and is therefore a valid basis for termination. Yousefzadeh had previously filed numerous complaints about Klager's alleged discrimination. Yet, while Hill-Rom took those seriously and conducted an investigation into their veracity, it also informed Yousefzadeh that it was inappropriate to constantly accuse his manager of being discriminatory in emails sent to other co-workers, as well as to continually reference any perceived religious association between Klager and her husband. (*See* Shatava Decl. [Doc. No. 77] at 5; *see also* Shatava Depo. [Doc. No. 76-1] at Dkt. 34, Depo. 83.) In fact, doing so was an express violation of Hill-Rom's policies forbidding discriminatory or harassing remarks based on religion. (*See* Kirkland Decl. Ex. H [Doc. No. 76-2] at 5; Kirkland Decl. Ex. I [Doc. No. 76-2] at 9.) Yet that is exactly what Yousefzadeh's May 2 mass email does. Essentially, his mass email was the functional equivalent of an "angry outburst in the presence of co-workers," over a hundred of them, *Kiel*, 169 F.3d at 1136, an electronic form of "abusive, derogatory conduct towards his employer," *id.*, despite "repeated warnings that he needed to change the way in which he" communicated, *Jackson*, 840 F.2d

at 1390. The shield of anti-discrimination laws only extends so far; the manner in which a complaint is made cannot be so unreasonable as to constitute a disruption of the workplace environment and a violation of a company's otherwise-lawful policies. Yousefzadeh fails to offer any evidence raising an inference—much less definitively showing—that he was fired for any reason other than violating company policy. Accordingly, he has failed to raise a genuine dispute of material fact regarding any pretext by Hill-Rom, and summary judgment as to his May 2 email basis for his retaliation claims is warranted.

### 2. Retaliation/Reprisal Based on Workplace Conditions

Turning to the second basis for his retaliation claim, Yousefzadeh also asserts that Hill-Rom retaliated against him for complaining about workplace safety issues and reporting discrimination—including filing an EEOC complaint—by changing her "attitude" towards him, impermissibly changing his job responsibilities, requiring him to use paid time off inappropriately, subjecting him to weekly reporting requirements, and by placing him on a performance improvement plan and action plan. (Pl. Mem. [Doc. No. 81] at 16–17.) For the reasons discussed below, the Court holds that Yousefzadeh has failed to establish a *prima facie* case of retaliation based on those grounds.

### a. Yousefzadeh Engaged in Protected Conduct by Reporting Perceived Discrimination and Filing an EEOC Complaint

As noted above, Hill-Rom admits—for good reason—that Yousefzadeh satisfies element one of a *prima facie* case of retaliation based on his reported complaints of discrimination to Hill-Rom Human Resources and other management personnel, as well as his EEOC complaint. (*See* Hill-Rom Mem. [Doc. No. 75] at 28.) Reporting discrimination

and filing an EEOC charge are both protected activities under Title VII and the MHRA. *See* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation for opposing unlawful employment discrimination); *Schoffstall v. Henderson*, 233 F.3d 818, 826 (8th Cir. 2000) (noting that filing an EEOC complaint is statutorily protected activity).

### b. There Is No Genuine Dispute Of Material Fact That Yousefzadeh Did Not Suffer An Adverse Employment Action As A Result Of His Discrimination Complaints or EEOC Complaint.

Next, the Court considers whether any of Yousefzadeh's alleged adverse employment acts establish element two of his *prima facie* case of retaliation. The Eighth Circuit defines an adverse employment action "as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jones v. City of St. Louis*, 825 F.3d 476, 480 (8th Cir. 2016) (citation omitted) (internal quotation marks omitted). Still, to be a "materially adverse action" it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Box v. Principi*, 442 F.3d 692, 696 (8th Cir. 2006) (citation omitted) (internal quotation marks omitted).

First, Yousefzadeh contends that Klager's attitude changed towards him following his email alleging workplace safety issues, as well as after he reported discrimination, and that such an attitude change constituted an adverse employment action. However, this argument lacks any factual basis other than his own assertions. There is simply nothing in the record demonstrating that Klager's "attitude" changed so negatively as to constitute a "tangible change in working conditions" that "produce[d] a material employment

disadvantage." *Jones*, 825 F.3d at 480. The only testimony purportedly showing a change in Klager's attitude towards Yousefzadeh comes from his own unsupported self-serving allegation. He stated in his deposition that during weekly meetings (at which Shatava was also present) Klager raised her voice at him, used raw or harsh language, and would not accept explanations for why he did things the way he did. (*See* Pl. Depo. [Doc. No. 76-1] at Dkt. 14, Depo. 174.) However, when asked about what he meant by harsh language, Yousefzadeh explained that it was Klager's "tone" of voice when she disagreed with his reasons for performing his job a certain way; he did not provide any examples of phrases, language, or other concrete examples of impermissible attitude shifts. (*Id.*)

Moreover, Shatava—who was present during these meetings as a third-party HR mediator—does not recount any harsh language, yelling, or any other impermissible attitude changes by Klager. (*See* Shatava Decl. [Doc. No. 77].) Put simply, Yousefzadeh's bare unsupported assertions of an "attitude shift" do not create a genuine dispute of material fact on this issue because "[a] plaintiff may not merely point to unsupported self-serving allegations" to create a dispute of fact; rather, a plaintiff must "substantiate [his] allegations with sufficient probative evidence that would permit a finding in [his] favor." *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (citation omitted) (internal quotation marks omitted). Yousefzadeh fails to do so on this point, and accordingly his claims of an "attitude shift" fail to constitute an adverse employment action.

Next, Yousefzadeh contends that Hill-Rom's change to his job responsibilities was an adverse employment action in retaliation for his reporting of alleged discrimination. (Pl. Mem. [Doc. No. 81] at 17.) (Klager Decl. [Doc. No. 79] at 4.) It is true that "[a]n 'increased

workload that materially changes an employee's duties can constitute an adverse employment action.' " *Kelleher v. Wal-Mart Stores, Inc.*, 817 F.3d 624, 631 (8th Cir. 2016) (citing *Sellers v. Deere & Co.*, 791 F.3d 938, 944 (8th Cir. 2015)). Here however, as mentioned above, Yousefzadeh's job responsibilities were broadly defined from the beginning of his employment, and his argument that he was being assigned tasks not within his job responsibility is simply incorrect. Yousefzadeh continues to argue that supplier quality and document control change duties were not his responsibility because they were not explicitly listed in his job description. (*See* Pl. Depo. [Doc. No. 76-1] at Dkt. 16, 187–188.) Yet overwhelming record evidence to the contrary exists. Yousefzadeh himself acknowledged in his deposition that the job duties listed in his job description were not exclusive, (*see* Fondungallah Decl. Pl. Depo. [Doc. No. 82-1] at 8–9, Depo. 84–85), and was informed many times throughout his employment that his job encompassed document control changes and supplier quality duties, (*see* Klager Decl. [Doc. No. 79] at 5; Kirkland Decl. Ex. N [Doc. No. 76-2] at 20–21 (summarizing Yousefzadeh's job duties and the amount of time each week he should be spending on each specific responsibility).) In fact, before he was even hired, Yousefzadeh was told by Klager that the QA/RA Engineer would be responsible for a wide range of tasks because the position was new to the St. Paul site; Klager even went so far as to inform him that the person selected for the QA/RA Engineer role would be required to perform job duties that were "not yet fully established." (Klager Decl. [Doc. No. 79] at 2–3.)

In any event, the job description provided to Yousefzadeh indicates that, among other duties, the QA/RA Engineer would be responsible for "[l]ead[ing] or support[ing]"

*any required Quality Improvement activities* in St. Paul[.]" (Kirkland Decl. Ex. D [Doc. No. 76-1] at 36 (emphasis added).) As noted above, this included document control change duties—a temporary project stemming from Hill-Rom's shift in manufacturing from South Carolina to Minnesota. Yousefzadeh's contention that Hill-Rom inflicted an adverse employment action against him by changing his job duties is devoid of record support and therefore cannot provide a basis for his retaliation claim. *See O'Brien*, 532 F.3d at 811 n.3.

Next, Yousefzadeh asserts that in retaliation for his complaints, Hill-Rom impermissibly required him to use paid-time off (PTO) for things like dentist appointments, and that doing so was an adverse employment action. (Pl. Mem. [Doc. No. 81] at 17 (citing Pl. Depo. [Doc. No. 82-1] at Dkt. 13, Depo. 112).) Certainly, it is true that changes in pay or benefits, or an employee's right to use benefits, constitutes a material adverse employment action. *See Jones*, 825 F.3d at 480. However, the only record support for Yousefzadeh's assertion comes from his own testimony in his deposition, where he indicated that he believed that "salar[ied] employee[s] . . . don't use PTO for making dentist appointment[s] over two hours because they are on salary." (Pl. Depo. [Doc. No. 82-1] at Dkt. 13, Depo. 112.) He further stated that his understanding of Hill-Rom's PTO policy was that salaried employees only need to use PTO "if you wanted to take eight hours or more . . . ." (*Id.*) Yousefzadeh noted that this belief was based on a conversation with another senior manufacturing engineer who purportedly informed Yousefzadeh that using PTO was only necessary for absences of eight hours or longer. (*Id.*) However, the Court has no sworn testimony from the other engineer Yousefzadeh claims to have spoken with— or any other evidence indicating that this is in fact true—and even if he did, there is no

indication that the senior manufacturing engineer's purported opinion regarding PTO is in fact the policy at Hill-Rom. And while it does not appear that a copy of Hill-Rom's PTO policy has been provided to the Court, Yousefzadeh *admitted* during his deposition that Hill-Rom's paid-time off policy *does not state* that he only needed to use paid-time off where he was absent for eight hours or more. (*Id.*) Accordingly, it appears to the Court from the context of Yousefzadeh's deposition testimony that Hill-Rom's PTO policy in fact required the use of PTO even for routine medical appointments. Regardless, Yousefzadeh's own admission that his view of paid-time off use did not conform to Hill-Rom's policy eliminates any genuine dispute of material fact over this basis for retaliation.

Finally, Yousefzadeh argues—without citation to any case law—that Hill-Rom inflicted an adverse employment action against him by placing him on a performance improvement plan and by subjecting him to weekly reporting requirements.[9] (Pl. Mem. [Doc. No. 81] at 17.) However, the Eighth Circuit has explicitly held that the placement of an employee on a performance improvement plan, "without more, [does] not constitute an adverse employment action." *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005); *see also Wilson v. Miller*, ;821 F.3d 963, 970 (8th Cir. 2016) ("[A] negative performance evaluation does not constitute an adverse employment action unless it causes

---

[9] The Court notes Yousefzadeh cannot argue that Hill-Rom's implementation of the February 10, 2016 PIP (*see* Kirkland Decl. Ex. S [Doc. No. 76-2]) or the January 2016 weekly meetings (*see* Shatava Decl. [Doc. No. 77] at 3–4) constituted retaliation for Yousefzadeh's EEOC or purported OSHA complaints because the EEOC and OSHA complaints came *after* Hill-Rom implemented the PIP and weekly meetings. (*See* Kirkland Decl. Ex X [Doc. No. 76-2] at 56–57 (noting that Yousefzadeh's OSHA violation complaint occurred on March 28, 2016); Kirkland Decl. Ex. DD [Doc. No. 76-3] (noting EEOC filing date was April 16, 2016).)

some tangible effect on the conditions of employment[.]").  Rather, for the use of PIP to constitute an adverse employment action, the PIP must be used later as a basis to alter the employee's terms and conditions of employment in a detrimental way.  *Id.* at 998–99 (citing *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004)).  Here, Yousefzadeh has failed to provide any evidence that the PIP he was placed on—which was eventually converted into a less severe Action Plan—detrimentally altered his job responsibilities or conditions of employment in any way.  Indeed, the PIP merely lists Yousefzadeh's perceived performance deficiencies, outlines Hill-Rom's expectations as to what Yousefzadeh should be doing and the level at which he should be performing, and implements weekly update meetings in order for Klager to track Yousefzadeh's planned improvement under the PIP.  The plan does not appear to alter his employment conditions, benefits, or responsibilities in any material way.  (*See* Kirkland Decl. Ex. S [Doc. No. 76-2].)

Similarly, Yousefzadeh's Action Plan—a less severe form of discipline than a PIP—also does not alter Yousefzadeh's employment conditions.  (*See* Kirkland Decl. Ex. W [Doc. No. 76-2].)  Accordingly, the mere institution of Yousefzadeh's PIP and subsequent Action Plan does not constitute an adverse employment action.  *See Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (noting than an employee's placement on a PIP "without more, did not constitute an adverse employment action").

The same is true for Yousefzadeh's weekly meetings; the meetings only began at the recommendation of HR and were intended to assist Yousefzadeh and Klager with communicating with each other effectively.  (*See* Shatava Decl. [Doc. No. 77] at 3–4.)

There is nothing in the record indicating that the weekly meetings altered Yousefzadeh's terms of employment or changed any right he had to employment benefits offered by Hill-Rom. Therefore, the meetings do not constitute an adverse employment action. *See Henthorn*, 359 F.3d at 1029 (noting that even where an employee felt "overly scrutinized," because "the terms and conditions of her employment did not change" and she "continued to receive the same salary and was given the same responsibilities," there was no adverse employment action).

Ultimately, Yousefzadeh cannot establish an adverse employment action against him on these grounds, and therefore cannot prove the second of his *prima facie* case of retaliation under Title VII or the MHRA. Accordingly, his retaliation claim fails.

## III.    CONCLUSION

Based on the submission and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Hill-Rom's Motion for Summary Judgment [Doc. No. 73] is **GRANTED**, and Plaintiff Yousefzadeh's Second Amended Complaint [Doc. No. 34] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: December 30, 2019                     s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge